**BATJAC PRODUCTIONS INC., a California Corp., Plaintiff–Appellant,**

v.

**GOODTIMES HOME VIDEO CORP., a Delaware Corp.; Marybeth Peters, Register of Copyrights, Defendants–Appellees.**

**No. 97–55947.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 5, 1998.

Decided Nov. 5, 1998.

---

**2.** The Hon. John M. Mason, United States Magistrate Judge for the District of Minnesota.

Bonnie E. Eskenazi, Greenberg, Glusker, Fields, Claman & Machtinger, Los Angeles, California, for the plaintiff-appellant.

Helene M. Freeman, Dorsey & Whitney, New York City, for the defendant-appellee.

David O. Carson, General Counsel, U.S. Copyright Office, and Alfred Mollin, United States Department of Justice, Washington, DC, for the intervenor, defendant-appellee.

Before: FLETCHER, THOMPSON and LEAVY, Circuit Judges.

FLETCHER, Circuit Judge:

Batjac Productions Inc. ("Batjac") appeals the district court's grant of summary judgment to defendant GoodTimes Home Video Corp. ("GoodTimes") and intervenor Marybeth Peters, Register of Copyrights ("Regis-

ter"). The district court denied Batjac's claim that GoodTimes violated its copyright in the screenplay "McLintock!" and that the Register had an obligation to register the copyright of the screenplay. The district court held that the publication of the motion picture, "McLintock!," effected the publication of the unpublished screenplay to the extent that the screenplay was incorporated into the film.

■ This case primarily turns upon whether § 7 of the Copyright Act of 1909, 17 U.S.C. § 1 *et seq.* (repealed effective 1978) ("1909 Act"), affords protection to intellectual properties that have "common law copyrights,"[1] or protects only federal statutory copyrights. We hold that the language of § 7 does not apply to common law copyrights.

We agree with the reasoning of *Classic Film Museum, Inc. v. Warner Bros., Inc.,* 597 F.2d 13 (1st Cir.1979), that a common law copyright in the underlying screenplay does not survive the motion picture's loss of copyright and falls into the public domain due to a failure to renew the movie's copyright. The judgment of the district court is AFFIRMED.

## BACKGROUND

In 1962, James Edward Grant wrote an original screenplay entitled "McLintock!". Almost immediately, he assigned to Batjac all of his rights in the screenplay, including "all draft versions and adaptations," with the "unqualified right to use said work, in whole or in part, in whatever manner [Batjac] may desire." Batjac was expressly granted all rights to obtain copyrights and to renew and extend those copyrights.

Batjac created the motion picture, "McLintock!," from the screenplay. The picture was released to the general public on November 1, 1963. The motion picture was registered for federal statutory copyright in 1963. Also in 1963, Batjac published a book and a comic book based on the screenplay. Both were registered for copyright.[2]

The copyright registration for the motion picture lapsed and McLintock! fell into the public domain in 1991 when it was not renewed. In 1993, GoodTimes began producing and selling videocassettes of McLintock!. In January 1996, pursuant to 17 U.S.C. § 411(a), Batjac applied to register for copyright two intermediate drafts of the screenplay as "unpublished" works. The original September 17, 1962 version of the screenplay was not submitted.

On February 23, 1996, Batjac commenced an action against GoodTimes in the United States District Court for the Southern District of New York alleging infringement of the copyright in both intermediate drafts of the screenplay.

On March 28, 1996, the Copyright Office declined to register the portions of the screenplays contained in the motion picture, now in the public domain. It determined that the release of the motion picture published the motion picture and all components of the motion picture, including the screenplay. The Register intervened in this action pursuant to 17 U.S.C. § 411(a) to defend its determination that the screenplays were in the public domain to the extent that they were incorporated into the motion picture.

The action was transferred to the Central District of California to consolidate with a previously filed action, *Maljack Productions, Inc. v. UAV Corp.,* D.C. Case No. 96–0749 DDP VAPx (the "UAV action"), raising the identical issue. The district court consolidated the case against GoodTimes with the UAV action but only for purposes of deciding the

---

**1.** Common law copyright is somewhat a misnomer because it refers to both common law and state statutory protection of an author's first publication right. 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 2.02 at 2–18 (1997) [hereinafter Nimmer]. Unlike federal statutory protection, common law copyrights do not protect authors from subsequent copying of their work once published, but instead provide only limited protection for the first publication.

**2.** GoodTimes contends that the book and comic book fell into the public domain when not renewed in 1991. However, since GoodTimes failed to introduce evidence that these publications were not renewed, we do not rely on this argument to affirm the district court. *Id.* (citing *McClure v. Life Ins. Co. of North America,* 84 F.3d 1129, 1133 (9th Cir.1996) and *Amalgamated Transit Union v. Brock,* 809 F.2d 909, 911 n. 2 (D.C.Cir.1987)). The district court did not address these publications in its order.

issue of registrability for copyright of the two draft screenplays. All parties moved for summary judgment. The district court in a published opinion granted the Register's and GoodTimes' cross-motions for summary judgment holding that the Register correctly refused to register the draft McLintock! screenplays because the screenplays had secured statutory copyright with the motion picture and had passed into the public domain when the copyright was not renewed. *See Maljack Prods., Inc. v. UAV Corp.*, 964 F.Supp. 1416, 1419 (C.D.Cal.1997).

## STANDARD OF REVIEW

We review de novo grants of summary judgment. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996). In reviewing the grant of summary judgment, we "must determine, viewing evidence in the light most favorable to the nonmoving party, whether genuine issues of material fact exist and whether the district court correctly applied the relevant substantive law." *Id.*

## ANALYSIS

The question put to us is whether the district court correctly held that the publication of the motion picture, McLintock!, published the incorporated portions of the pre-existing, unpublished screenplay. This turns on the interpretation of § 7 of the 1909 Act. If the screenplay remained unpublished during the period 1963 to 1978 as Batjac contends, then it would have gained statutory protection in 1978 under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* ("1976 Act"), and would still be protected today.[3] If however, publication of the movie also published the incorporated portions of the screenplay, then those portions of the screenplay entered the public domain in 1991 along with the motion picture. Batjac argues that the district court's holding violates § 7 of the 1909

Act which protects the copyright of pre-existing works from destruction by publication of derivative works.

### Overview

Batjac secured copyright for McLintock! under the 1909 Act. The 1909 Act recognizes that both federal and state law provide copyright protection. *See* 1 Nimmer § 2.02. Unpublished works were protected by state common law or statute, while published works were protected by federal statute. *Id.* State "common law" protection attached upon creation of the work and ended with publication of the work. Once published, the only protection available was federal statutory copyright. Publication of a work with proper notice secured the statutory copyright. 17 U.S.C. § 10 (repealed). Statutory copyright provided an initial 28 year term of protection and a 28 year renewal term. § 24 (repealed). To get the renewal term protection, copyright owners had to apply for renewal.

The 1976 Act eliminated common law protection. Under the 1976 Act, unpublished works lost their common law protection but gained statutory protection. The statutory protection for works created but unpublished as of January 1, 1978 endures until 50 years after the authors death or until the year 2002, whichever is longer. § 303. The renewal term for works with subsisting copyrights as of the implementation date for the 1976 Act, January 1, 1978, was lengthened to 47 years but the requirement that copyright owners must apply for renewal was left in place.[4]

Batjac failed to renew the motion picture's copyright in 1991 and now seeks to maintain control of the film by asserting Batjac's rights as copyright holder of the underlying

---

3. Section 303 of the 1976 Act provides that:
   Copyright in a work created before January 1, 1978, but not theretofore in the public domain or copyrighted, subsists from January 1, 1978, and endures for the term provided by section 302. In no case, however, shall the term of copyright in such a work expire before December 31, 2002; and, if the work is published on or before December 31, 2002, the term of the copyright shall not expire before December 31, 2027.
   17 U.S.C. § 303.

Grant died in 1966. The 1976 Act would protect the unpublished screenplay until 2016 (the life of the author plus 50 years as provided in § 302). If the screenplay were published on or before December 31, 2002, the term of the copyright would be extended to 2027 under § 303.

4. The Copyright Renewal Act of 1992 amended the 1976 Act by providing for automatic renewal. This Act is prospective only and so does not apply to Batjac's failure to renew.

screenplay. Batjac's argument is that the publication of the motion picture did not affect the common law copyright protection over its pre-existing, unpublished screenplay.[5] Rather, Batjac argues that its common law rights were protected by § 7 of the 1909 Act which protects subsisting copyrights against loss that otherwise could occur from the publication of derivative works.

The district court disagreed. It found that publication of the motion picture also published the screenplay. It relied on an opinion of the First Circuit, *Classic Film Museum, Inc. v. Warner Bros., Inc.*, 597 F.2d 13 (1st Cir.1979). The district court rejected the notion that the 1909 Act extended § 7 protection to common law copyrights. Further, it rejected the claim that the Supreme Court decision in *Stewart v. Abend*, 495 U.S. 207, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990), applied to common law copyrights. Batjac contends that the district court erred in its analysis of § 7 and *Abend*.

### Section 7 of the 1909 Act

#### A. The Meaning of § 7 Under the 1909 Act

Section 7 provides that the publication of a derivative work does not affect the validity of a subsisting *copyright* in the preexisting work. Whether the term "subsisting copyright" in § 7 means "statutory copyright" or "statutory and common law copyright" is critical to our inquiry. In pertinent part, Section 7 provides:

> Compilations or abridgements, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works

when produced with the consent of the proprietor of the copyright in such works, or works republished with new matter, [i.e., derivative works] shall be regarded as new works subject to copyright under the provisions of this title; but the publication of any such new work shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works.

17 U.S.C. § 7 (repealed effective 1978) (alteration added).[6] Since the meaning of "subsisting copyright" is not readily apparent, we employ the usual techniques of statutory construction to assist our interpretation. We look to the statutory language, the legislative history, and the Register's interpretation. *See, e.g., Funbus Sys., Inc. v. California Pub. Utils. Comm.*, 801 F.2d 1120, 1125–25 (9th Cir.1986).

#### 1. *Language of the 1909 Statute.*

The district court held that § 7 applies only to statutory copyrights:

> The 1909 Act was very precise when it addressed common law rights, which the statute explicitly states are not to be limited or annulled. *See, e.g.,* 17 U.S.C. § 2 (repealed effective 1978) (referring to the "right[s] of the author or proprietor of an unpublished work"). Therefore, section 7 and the [*Abend*] opinion must be read to refer only to a subsisting statutory copyright. . . . Had Congress wanted section 7 to apply to common law rights, it would

---

5. That the movie was "published" within the meaning of the 1909 Act, *see American Vitagraph, Inc. v. Levy*, 659 F.2d 1023, 1029 (9th Cir.1981) ("publication" of a motion picture does not occur until the film is in commercial distribution), was not disputed by the parties in this appeal. *Cf. Dolman v. Agee*, 157 F.3d 708, 713 (9th Cir. 1998) (in light of insufficient evidence of publication, declining to reach the question of whether publication of a motion picture constituted publication of songs contained therein).

6. Under the 1976 Act, a "derivative work" is a work based on one or more preexisting works. 17 U.S.C. § 101. On the facts presented, it is undisputed that the motion picture "McLintock!" qualifies as a derivative work of the screenplays written by Grant.

The language of § 7 refers to "new works" not "derivative works." GoodTimes contends that "derivative works" was not a concept embodied by the 1909 Act and that "new works" were limited to work based on works in the public domain or previously copyrighted material. The motion picture would be the first publication of the screenplay. However, the Supreme Court uses the terms "new works" and "derivative works" interchangeably in discussing the 1909 Act. *See Abend*, 495 U.S. at 230–31, 110 S.Ct. 1750. We see the issue as one of semantics, not substance. A derivative work under the 1909 Act need not have the same relationship to the unpublished work as a derivative work has to the unpublished work under the 1976 Act.

have stated that section 7 applied to common law rights.

*Maljack Prods., Inc. v. UAV Corp.*, 964 F.Supp. at 1423–24.

Batjac contends that the term "copyright" includes both statutory and common law copyrights.[7] The district court held that the term "copyright" was limited to statutory copyright by finding that common law protections were " 'referred to somewhat inaccurately' as common law copyright." 1 Nimmer § 2.02 at 2–18.[8] We do not find this analysis persuasive.

To determine the intended meaning of the term "copyright," Batjac suggests that we look to how the term "copyright" was commonly understood within the legal lexicon circa 1909. Alternatively, GoodTimes and the Register suggest that we look to the use of the term "copyright" in the 1909 Act, itself, and assign the identical meaning to the term throughout.

Batjac claims that the common meaning of the term "copyright" circa 1909 included both statutory and common law copyright. Good-Times disputes this arguing that "[i]t is perfectly well settled that the protection given to copyrights in this country is wholly statutory." *White–Smith Music Publ'g Co. v. Apollo Co.*, 209 U.S. 1, 15, 28 S.Ct. 319, 52 L.Ed. 655 (1908). In reviewing the numerous sources cited by the parties, we agree with Batjac that the term "copyright" included both statutory and common law protection in the lexicon of both courts and treatise writers circa 1909. *See, e.g., Bobbs–Merrill Co. v. Straus*, 147 F. 15, 18 (1906) (using the term "common law copyright" but noting that there is a "fundamental distinction between common-law right of literary property, commonly called common-law copyright, and copyright under the statute"), *aff'd*, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086 (1908). However, there was also a recognition of the differences between statutory and common law protection. *See, e.g., Caliga v. Inter Ocean Newspaper Co.*, 215 U.S. 182, 188, 30 S.Ct. 38, 54 L.Ed. 150 (1909) (holding that "[s]tatutory copyright is not to be confounded with the common law right"). So while Congress could have used the term "copyright" to refer to common law copyright in § 7, it need not have done so. Indeed, Congress' awareness of the two systems of copyright protection, as evidenced by its inclusion of § 2,[9] supports our finding that Congress chose not to refer to common law protections as "common law copyrights" under the 1909 Act.

Looking to the language of the 1909 Act, we recognize that it is a "basic canon of statutory construction that identical terms within an Act bear the same meaning." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479, 112 S.Ct. 2589, 120 L.Ed.2d

---

**7.** Batjac makes two other arguments challenging the district court's interpretation of § 7. First, Batjac argues that by reading the word "statutory" into § 7 after "subsisting," the district court violated a basic rule of statutory construction—that the Court lacks the power "to read in the statute words not explicitly inserted by Congress." *Stanton Road Assocs. v. Lohrey Enters.*, 984 F.2d 1015, 1020 (9th Cir.1993). We disagree. This argument cuts both ways because Congress also did not insert the word "common law" to define copyright. So either interpretation of the term "copyright" necessarily entails our defining the term to mean statutory copyright or statutory plus common law copyright.

Second, Batjac argues that the district court ignored the word "any" in the phrase "any subsisting copyright." Batjac contends that inclusion of "any" encompasses all copyrights, statutory and common law. This argument has some facial appeal, but like the previous argument the key issue is the meaning of the term "copyright" within the 1909 Act. Since that definition is determinative, the scope of "any" is dependant upon our resolution of the meaning of copyright first. Nor is it illogical to find that the term "any" applies only to statutory copyrights. The 1909 Act ushered in a new regime and copyrights secured under prior statutes were likely referenced by the inclusion of "any."

**8.** The district court's quote from Nimmer is inapposite. Nimmer inserts a footnote explaining that the "somewhat inaccurately" is included because some of the "common law copyright" protection was in fact statutory in given states. 1 Nimmer § 2.02 at 2–18 n. 1. Nimmer later writes that common law copyrights were " 'equivalent' to statutory copyright." *Id.* at 2–19.

**9.** Section 2 provides that: "Nothing in this title shall be construed to annul or limit the right of the author or proprietor of an unpublished work, at common law or in equity, to prevent the copying, publication, or use of such unpublished work without his consent, and to obtain damages therefore." 17 U.S.C. § 2 (repealed effective 1978).

379 (1992) (citations omitted). As a starting point, the Register points to numerous uses of the term "copyright" within the 1909 Act that can only refer to statutory copyright, *see, e.g.,* §§ 1, 3, 6, 8, 10, 12 & 13, and to uses of the term "subsisting copyright" that can only mean statutory copyright, *see, e.g.,* §§ 3, 19 & 25.

Batjac responds that these referenced provisions all employed limiting language, *see, e.g.,* §§ 1, 3, 4, 5, 9, 10, 24, 28, 101, 104, 207, or otherwise made the limitation patently obvious from the context, *see, e.g.,* §§ 6, 13, 19, 25. Batjac goes on to argue that the use of such limiting language cuts against the Register's and GoodTimes' interpretation of § 7 because in § 7 the only qualified use of the term "copyright" refers to new works. Batjac's analysis of the cited sections' use of limiting language or obvious context to modify the term "copyright" is a plausible interpretation of the 1909 Act. However, under this reading, the term "copyright" would refer to "common law copyright" essentially only under § 7–a rather convenient but dubious interpretation.

The only section where the 1909 Act explicitly refers to rights under common law is § 2. However, § 2 does not use the term "copyright" to describe the common law rights in intellectual property. The absence of the term "copyright" in § 2 suggests that Congress intended to limit the use of the term "copyright" under the 1909 Act to "statutory" copyright.

While § 2 is the primary place in the 1909 Act specifically referencing common law protection without calling it copyright protection, more subtle examples exist in § 10 and § 12. Throughout § 10 and § 12, the 1909 Act provides for "securing copyright" protection through publishing with notice, § 10, and securing a copyright by depositing with the Copyright Office, § 12. However, neither section references the already existing common law copyright protection being divested. So under Batjac's reading of the statute, we have to imply "statutory" before copyright within these provisions to distinguish the copyright being secured from the common law copyright being divested. The omission of any reference to the divested common law copyright within these sections cuts against Batjac's claim that "copyright" includes common law copyrights.

Similarly, the last part of § 7 states that what it calls a new work (a derivative work in our parlance) shall not be construed "to secure or extend copyright in such original works." The Register argues that since common law copyright is perpetual and arises upon creation, this language, "secure" and "extend," can only refer to statutory copyright. If the last reference to "copyright" in § 7 means "statutory copyright," the basic rule of applying identical meanings to the same terms leads us to find that earlier references in the provision also mean "statutory copyright."

Overall, we agree with GoodTimes and the Register that Congress used the term "copyright" to refer to statutory copyright in the 1909 Act. We do not stop here because enough doubt exists that we could be persuaded otherwise by contrary legislative history or agency action or interpretation.

### 2. *Legislative History.*

Unfortunately, the legislative history concerning § 7, in this regard, is scant and inconclusive. Batjac argues that legislative intent to apply § 7 to common law copyrights can be divined from a change Congress made in the language of § 7. In finalizing the language of § 7, Congress changed the wording *"no such copyright shall* affect the force or validity of any subsisting copyright" to *"the publication of any such new works shall not* affect the force or validity of any subsisting copyright." *See Hearing Before the Committees on Patents* at 78 (March 26, 1908) (testimony of Mr. W.B. Hale, American Law Book Company) [hereinafter *Hearing* ]; *see also Abend,* 495 U.S. at 249 n. 14, 110 S.Ct. 1750 (Stevens, J., dissenting) (quoting the testimony of Mr. Hale). This change was made after Congress heard the testimony of a witness, Mr. W.B. Hale, who urged adoption of the change to prevent a derivative work from affecting the "original copyright." *Id.* Batjac contends that this change in language signaled Congress's intent to protect common law copyrights. The origin of this analysis comes from the Supreme Court's opinion in *Abend,* where the Court discussed

this particular legislative history. *See Abend*, 495 U.S. at 233, 110 S.Ct. 1750 (citing Note, *Derivative Copyright and the 1909 Act–New Clarity or Confusion?*, 44 Brook. L.Rev. 905, 919–20 (1978)).

Despite this argument's auspicious origin, it falls short of proving that Congress intended to protect common law copyrights with § 7. The revision requested by Hale changed only the emphasis in the *subject* of the sentence, the derivative work. It did not change the *object*, the subsisting copyright. Since it is the object of the sentence that Batjac would have embrace common law copyrights as well as statutory, the revising of the subject to expand coverage to all derivative works, not just copyrighted derivative works, provides no indication of Congress's intended meaning with respect to the object, "subsisting copyrights." Hale's statement was merely his own witness testimony before the legislature and so offers only marginal insight into the legislative intent behind the passage of § 7.

What we find most significant, however, is that Hale makes no mention of common law copyright in his statements to Congress. It is only later, in a *Brooklyn Law Review* note, that his testimony was interpreted to include reference to "smaller selections that might or might not have been previously published and separately copyrighted." *See* Note, *supra* at 919. The note's creative interpretation of Hale's legislative testimony caught the Supreme Court's eye. Referencing the note and Hale's testimony, the Court stated that "[t]he language change was suggested only to ensure that the publication of a 'new compiled work' without proper notice, *including smaller portions that had not been previously published and separately copyrighted*, would not result in those sections moving into the public domain." *Abend*, 495 U.S. at 233, 110 S.Ct. 1750 (citing Note, *supra* at 919–920).

Reviewing Hale's testimony, we find nothing to suggest that he was concerned with the publication of unpublished works in new compilations as suggested by the Brooklyn Law Review note. The *Abend* opinion offers no other source to support its statement, nor, ironically were common law rights at issue in the case before the Court. Rather, the concern Hale expressed was that the publication of a new compilation without a copyright could adversely affect a pre-existing copyrighted work. *Hearing* at 78. Hale was concerned with what the derivative work encompassed, not with the breadth of the meaning of subsisting copyright.

### 3. *Agency Interpretation.*

■ "[T]he Register has the authority to interpret the copyright laws and [ ] its interpretations are entitled to judicial deference if reasonable." *Marascalco v. Fantasy, Inc.*, 953 F.2d 469, 473 (9th Cir.1991). The Register argues that it has a long-standing policy that "publication of [a] motion picture constitutes the publication of its soundtrack." In its Compendium II concerning the publication of screenplays under the 1976 Act, the Register provides:

> Where a preexisting unpublished screenplay is embodied in a motion picture, those elements of the screenplay disclosed in the motion picture are considered to be published at the same time the motion picture is published.

Compendium II, Compendium of Copyright Office Practices 910–04 (1984). However, the Register admits that its practices under the 1909 Act are covered by Compendium I, not Compendium II. Under Compendium I, the Register concedes it took no position on whether a motion picture copyright covers the sound track.

Compendium I provides that:

Publication of a portion of a work does not necessarily mean that the work as a whole has been published.

Examples:

(1) Publication of a detailed plot summary of a play does not constitute publication of the play as a whole.

(2) Publication of a movie version of an unpublished story does not constitute publication of the story as such.

Compendium I, § 3.1.1 IV(a). Batjac argues that example 2 proves the opposite of the Register's claim. The Register counters that example 2 merely demonstrates the proposition that publication of part does not publish the whole but just those portions incorporated into the published work. As further evi-

dence of its policy, the Register notes that the registration forms did not provide space to list unpublished works or common law copyrights. Indeed, Batjac's 1909 Act copyright application has a section for "Previous Registration and Publications" but provides no space for pre-existing unpublished works. The Register contends that unpublished works were not required on the application because of the Register's policy to treat the publishing of the motion picture as a publication of the underlying screenplay.

The Register's position is reasonable and consistent with our review of the contemporaneously used registration forms used under the 1909 Act. We conclude that it is entitled to deference.

Overall, we are persuaded that § 7 does not protect common law copyrights under the 1909 Act. This does not mean, however, that common law copyrights have no protection from publication by derivative works, but in the narrow case before us where the common law copyright and derivative work are held by the same entity, publication of the motion picture publishes the screen play to the extent that it is incorporated into the movie.

### B. *Stewart v. Abend*

Batjac contends that we are bound to reach the opposite result because of language used in *Stewart v. Abend,* 495 U.S. 207, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990). We disagree. In *Abend,* the Supreme Court did not discuss § 7 as grounds for its holding, but rather to rebut an argument advanced in the dissent. In relevant part, the Supreme Court stated:

> The language change [to § 7] was suggested only to ensure that the publication of a "new compiled work" without proper notice, including smaller portions that had not been previously published and separately copyrighted, would not result in those sections moving into the public domain. *See* Note, 44 Brook. L.Rev. at 919–920.

*Abend,* 495 U.S. at 233, 110 S.Ct. 1750.

The issue that the Supreme Court addressed was whether continued publication of a derivative work—the motion picture *"Rear Window"*—infringed on the copyright of a pre-existing copyrighted work when the right to use the pre-existing work lapsed during the renewal period due to the death of the author of the pre-existing work. 495 U.S. at 213, 110 S.Ct. 1750. Despite an agreement by the author to transfer renewal rights to the. moviemakers—Alfred Hitchcock and Jimmy Stewart—the executors renewed the copyright to the picture but refused to transfer the rights. *Id.* at 212, 110 S.Ct. 1750.

In an earlier appeal, this court had held that the copyright in the pre-existing work was not defective and that re-release of the film infringed on its copyright. *Id.* at 214, 110 S.Ct. 1750 (citing *Abend v. MCA, Inc.,* 863 F.2d 1465, 1472 (9th Cir.1988)). This court's ruling created a circuit split with the Second Circuit which had held that "statutory successors to the renewal copyright in a pre-existing work under § 24 could not 'depriv[e] the proprietor of the derivative copyright of a right ... to use so much of the underlying copyrighted work as already has been embodied in the copyrighted derivative work." *Abend,* 495 U.S. at 215, 110 S.Ct. 1750 (quoting *Rohauer v. Killiam Shows, Inc.,* 551 F.2d 484, 492 (2d Cir.1977)). The Supreme Court affirmed this court's holding, finding that under § 24 the copyright in a pre-existing work is not extinguished during the renewal period with respect to its incorporation into the derivative work. *Id.* at 216, 110 S.Ct. 1750.

The case did not involve common law copyrights. "It Had to Be Murder" was a statutorily copyrighted story whose motion picture rights had been sold to predecessors of Hitchcock and Stewart. Hitchcock and Stewart acquired the rights and made the movie "Rear Window." Any applicability of § 7 to an unpublished or common law protected right was not at issue. Were we to take the Court's stray comment out of context and hold that § 7 applies to common law copyrights, the effect in our case would be one Congress never intended.

The passage referring to § 7 injected itself into the opinion because the dissent in *Abend* argued that " § 7 was intended ... to give the original author the power to sell the right to make a derivative work that upon creation and copyright would be *completely independent of the original work."* 495 U.S. at 244–

45, 110 S.Ct. 1750 (Stevens, J., dissenting) (emphasis added). The dissent argued that when Congress deleted the word "copyright" and inserted "publication," it was making clear "that it was the publication of the derivative work, not the copyright itself, that was not to affect the force or validity of any subsisting copyright." *Id.* at 249, 110 S.Ct. 1750 (internal quotations omitted). In the dissent's view, this change clarified that the derivative work and the pre-existing work were independent and one could not affect the other.

The majority reached the opposite interpretation of § 7 and of Congress' intent in changing the language of § 7. It held that § 7 allowed a derivative work to be copyrighted while insuring that the pre-existing work retained full copyright protection over its use within the derivative work. 495 U.S. at 230–31, 110 S.Ct. 1750. The majority's insertion of the language relating to unpublished works, e.g., common law copyrights, came about in its response to the dissent's characterization of Congress' intent in revising § 7. The majority responded by arguing that the change to § 7 was meant to close a loophole in the section that would have protected subsisting works from derivative works with copyrights but not from the publication of derivative works without copyrights or with failed copyrights. It was not meant to change the relationship of derivative works to original works. *Id.* at 233, 110 S.Ct. 1750. For support of its position, the majority referenced the legislative history of the revision and cited to a law review note. Paraphrasing the note,[10] the Court inserted the language "including smaller portions that had not been previously published and separately copyrighted," *id.*, even though that language was neither supported by Hale's testimony to Congress, *see Hearing, supra,*

nor by any cited authority in the law review note, *see* Note, *supra* at 919.

The district court found that this passage was dictum citing Nimmer on Copyright. *See* 1 Nimmer § 4.12[B] at 4–65 to 4–66.[11] Although dicta of the Supreme Court is entitled to considerable deference, *see, e.g., McCoy v. Massachusetts Institute of Technology,* 950 F.2d 13, 19 (1st Cir.1991), the factors surrounding this particular dicta warrant our conclusion that, in this case, it is not controlling. *See United States v. Crawley,* 837 F.2d 291, 292–93 (7th Cir.1988) (noting reasons for rejecting dicta, such as (1) unnecessary to the outcome of the case; (2) can be deleted without affecting the argument; (3) not grounded in the facts of the case; (4) issue addressed was not present as an issue in the case).

The reasons presented by the Seventh Circuit in *Crawley* for not following dicta are persuasively present here. In *Abend,* the majority's discussion of the legislative change was to refute the dissent's argument by showing that Congress intended to grant more protection to pre-existing works by expanding the definition of derivative works in response to the dissent's claim that the changes to § 7 provided less protection. As such, the disputed language referring to unpublished works was unnecessary to the Court's argument because the argument was over the subject of the § 7 sentence, while the disputed language relates to the object of the sentence. Nor was the Court facing an issue of common law copyright in an unpublished work, rather, it was trying to resolve a problem of renewal rights under § 24. The reference to unpublished works could be deleted without affecting the majority's argument. *Abend* upheld the *Ricordi/Russell* line of cases which hold that a pre-existing copyright holder can sue for infringement in

---

10. In relevant part, the note states:

Mr. Hale was concerned with a particular class of derivative work, namely, a "new compiled work," such as an anthology, made up of smaller selections that might or might not have been previously published and separately copyrighted.

Note, *supra* at 919.

11. The treatise, Nimmer on Copyright, contends that "the general rule is that publication of a

derivative work constitutes publication of the basic work." 1 Nimmer § 4.12[A] at 4–60. Addressing the effect of *Abend* upon this "general rule," Nimmer notes that the disputed passage is dictum, cautions that "further thought should be given to the wisdom of converting [the dictum] into a binding holding," and notes that the Seventh Circuit subsequently reached a contradictory result in *Harris Custom Builders, Inc. v. Hoffmeyer,* 92 F.3d 517 (7th Cir.1996). *Id.* § 4.12[C] at 4–66.

the event that a public domain derivative work is used without authorization. *See Russell v. Price,* 612 F.2d 1123 (9th Cir. 1979); *G. Ricordi & Co. v. Paramount Pictures, Inc.,* 189 F.2d 469 (2d Cir.1951). It did not address the circumstance where the owner of the rights in an unpublished work is also the creator of the derivative work.[12]

The complex public policy considerations surrounding the application of § 7 to unpublished works were not discussed by the Court in *Abend.* They lend support to our holding. We are concerned about letting "unpublished" works resurrect copyright protection over derivative works that have already entered the public domain. While statutory copyrights allow for a limited monopoly, common law rights are perpetual. So under the dual system of protection in place under the 1909 Act, if we were to agree with Batjac, an author could extend indefinite control over a derivative work through an unpublished pre-existing work. *See Classic Film Museum, Inc. v. Warner Bros., Inc.,* 597 F.2d 13 (1st Cir.1979). While this problem has been eliminated by passage of the 1976 Act, the copyright in any film that has entered into the public domain under the 1909 Act could be resurrected by an unpublished screenplay.

The effective functioning of the Register also dictates our holding. As the district court noted since common law unpublished works are unrecorded, a "person seeking to use the public domain work likely would not know and could not determine whether such a work existed." For example, in Batjac's application for copyright protection of McLintock!, Batjac did not note the pre-existing screenplay even though the registration form included a section to list "Previous Registration or Publications." So Good-Times and the Register could not have known that McLintock! was not fully in the public domain due to the existence of unpublished drafts of the screenplay. Since unpublished works are not kept within the records of the Register, the public would have no means to determine whether a work actually entered the public domain under Batjac's interpretation of § 7. The resulting market uncertainty would inhibit the public's use of public domain materials.

Nor would allowing Batjac to control the movie McLintock! advance the progress of science and useful arts. Rather, protection of unpublished screenplays merely would signal to authors that they need not follow the Copyright Act in order to maintain copyright protection. Batjac reaped the full reward of copyright protection in its screenplay. Batjac held copyright in both the motion picture and the screenplay and, as a result, was able to fully exploit the profit making potential of the screenplay in any manner it chose. We find no indication that Congress intended § 7 to allow authors to maintain perpetual monopolies over their copyrightable works. So we are compelled to find that § 7 does not apply to unpublished works protected by common law copyrights.

### Publication of the Screenplay

■ Since we hold that § 7 does not apply to unpublished works protected by common law copyrights, we look to the relevant facts surrounding the publication of McLintock! to determine if its publication also published the incorporated portions of the screenplay. The district court relied on *Classic Film Museum, Inc. v. Warner Bros., Inc.,* 453 F.Supp. 852 (D.Me.1978), *aff'd,* 597 F.2d 13 (1st Cir. 1979) and *Harris Custom Builders, Inc. v. Hoffmeyer,* 92 F.3d 517, 520 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 956, 136 L.Ed.2d 842 (1997), to hold that an unpublished screenplay protected by common law is published by a motion picture to the extent that it is incorporated. As Batjac held publication rights to both the screenplay and the motion picture, we agree.

*Classic Film* involved the identical issue we face here. In *Classic Film,* the defendant sought to use its common law copyright

---

12. Batjac argues that the passage is not dicta because the Court was directly considering and rejecting a point made by the dissent. *See United States v. Santana,* 6 F.3d 1, 9 (1st Cir.1993). Two district courts have held that §.7 protects common law copyrights per *Abend. See Shoptalk, Ltd. v. Concorde–New Horizons Corp.,* 897 F.Supp. 144, 146 (S.D.N.Y.1995); *Jim Henson Prods., Inc. v. John T. Brady & Assocs.,* 867 F.Supp. 175, 186 (S.D.N.Y.1994). We are not persuaded. *Shoptalk* follows *Jim Henson* which interpreted the same language from *Abend* that we now address. Neither opinion adds to our analysis of *Abend,* nor are these opinions binding precedent.

in an unpublished screenplay to exert control over any unauthorized duplication of the film, *"A Star is Born,"* which had entered the public domain through a failure to renew its copyright. 597 F.2d at 13–14. The First Circuit acknowledged that a statutory copyright in a pre-existing work protected that work from entry into the public domain by a derivative work under *Ricordi,* but declined to extend *Ricordi* to common law copyrights. *Id.* at 14. It reasoned that the perpetual protection provided to common law copyrights would "swallow the rule of limited monopoly found in the constitution and copyright statutes" because through the unpublished screenplay, an author could maintain perpetual control over the motion picture. *Id.* at 14–15. *Classic Film* reached its holding without resolving the scope of § 7 and whether publication of a motion picture constitutes publication of the screenplay. *See* 453 F.Supp. at 854 n. 1.

We do not agree with Batjac that the rationale supporting *Classic Film* is moot because Congress eliminated the potential for a perpetual monopoly by passage of the 1976 Act and eliminating common law rights. The district court in *Classic Film* addressed the impact of the 1976 Act noting that even under the 1976 Act a common law copyright would act to extend protection of the film beyond its statutory maximum. 453 F.Supp. at 856 n. 4.[13] The Register also argues that *"Classic Film* turns upon impropriety of the moviemakers' use of artifice to extend the term limits set forth in the Act for copyrighted works" and so continues to have force today. We agree.

■■■ An analogous result was reached under the 1976 Act by the Seventh Circuit in *Harris.* Under the 1976 Act, an unpublished work is entitled to copyright protection as long as it is unpublished, it is published with notice, or, if it is published without notice, it is registered within five years and subsequently published with notice. 17 U.S.C. § 405. As under the 1909 Act, an underlying work copyrighted under the 1976 Act re-

mains copyrighted even if the derivative work enters the public domain. *See* 17 U.S.C. § 103(b).

In *Harris,* the plaintiff, Harris Custom Builders, Inc., produced a brochure containing abbreviated drawings from unpublished blueprint plans. 92 F.3d at 519. The brochure was not copyrighted and so entered into the public domain. *Id.* A builder subsequently used the drawings from the brochure. Harris sued claiming that the builder's use of the drawings infringed upon his copyright in the unpublished plans. *Id.* at 520. The Seventh Circuit disagreed and held that the drawings in the brochure were a derivative work and that the publication of the derivative work constituted publication of the pre-existing work. *Id.* (citing 1 Nimmer § 4.12[A] n. 2). The court noted that although the 1976 Act abolished common law copyright, that "does not mean that one can claim copyright based on [a] work[ ] being unpublished [ ] after it is published with one's permission." *Id.*

The *Harris* court noted that its result would be different if the underlying work had been separately registered, *id.,* and might also be different if a stranger had published the derivative work without permission of the owner of the underlying work, *id.* at 520–21. The court concluded: "However, when it is Harris itself which publishes the abbreviated drawings, it can no longer claim a copyright based on their unpublished nature." *Id.* at 521.

Batjac argues that *Harris* is distinguishable because the plans published in the brochure were in the same medium as the blueprint plans and were virtually identical to the portion of the blueprint that was copied. In contrast, a screenplay and a motion picture are in different media, with the motion picture adding new audio and visual material. Batjac cites *White–Smith Music Publ'g Co. v. Apollo Co.,* 209 U.S. 1, 17, 28 S.Ct. 319, 52 L.Ed. 655 (1908), for the proposition that publication in different media are not copies.[14] *See also Nucor Corp. v. Tennessee*

13. The First Circuit expressly adopted the district court's opinion. *See* 597 F.2d at 15.

14. Although *White–Smith* remains good law, this court declined to extend *White–Smith*'s holding to cover publication in *La Cienega Music Co. v.*

*ZZ Top,* 53 F.3d 950, 953 (9th Cir.1995). *White–Smith* held that a piano roll is not a copy of the underlying work. 209 U.S. at 18, 28 S.Ct. 319. This presents a conundrum, for if *White–Smith* controls, then publication of the movie would not even be a copy of the screenplay, *id.,* and so it

*Forging Steel Serv., Inc.,* 476 F.2d 386 (8th Cir.1973) (holding that construction of a three-dimensional building does not constitute publishing of the written plans). Batjac further contends that *Harris* does not apply because a motion picture is in no sense a "copy" of a screenplay. Rather a motion picture is an interpretation of a screenplay, a performance. We disagree.

█ Under common law, Batjac had a right of first publication which it exercised by publishing the motion picture. Unlike a performance,[15] the motion picture was recorded onto a fixed medium, film, that is reproducible and distributable. Batjac's common law right of first publication does not entail multiple first publication rights in every available medium. As holder of the ·common law rights in the screenplay and motion picture, Batjac chose to exercise its right to first publish in the medium of film. Batjac had the opportunity to secure copyright in the screenplay separate from the movie but chose not to do so. It cannot now attempt to regain its first publication rights 35 years after it produced the screenplay within the motion picture.

Our holding is supported by the protections provided to copyrightable material used in a motion picture under the 1909 Act. Section 3 of the 1909 Act protects all copyrightable component parts of a copyrighted work. 17 U.S.C. § 3 (repealed effective 1978). The McLintock! screenplay was copyrightable and is a component of the motion picture to the extent it was incorporated into the film. As such, it fell into the public domain with the motion picture. The Register points to *Maljack Prods., Inc. v. GoodTimes Home Video Corp.,* 81 F.3d 881, 885 n. 3 (9th Cir. 1996), to illustrate that the screenplays would either be components of the movie or otherwise part of the public domain. While Batjac disputes that a screenplay is a component part of a motion picture, any other result under the 1909 Act would grant an author

multiple rights to first publication and would allow an author to publish in one medium with a statutory copyright but leave the work unpublished in a separate medium to extend copyright protection in perpetuity. *See Classic Film,* 597 F.2d at 14–15.

We find no statute or case law holding that a textual work can only be published by print. Rather, the Supreme Court has stated that "[t]he right of first publication encompasses not only the choice whether to publish at all, but also the choices when, where, and in what form first to publish a work." *Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 564, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

In addition, our holding is consistent with this court's decision in *La Cienega Music Co. v. ZZ Top,* 53 F.3d 950 (9th Cir.1995). In *La Cienega,* we held that publication of a musical composition called *Boogie Chillen* occurred when the recorded song was released to the general public, even though the recording existed in a different medium than the printed version of the composition. *Id.* at 952–53. We noted that otherwise a song left unpublished and protected by common law copyright would gain an advantage over a song copyrighted in compliance with the 1909 Act which would have only 28 years of protection. *Id.* at 953. Although the result of our holding in *La Cienega* has been subsequently changed by Congress' passage and enactment of H.R. 672, its reasoning is still sound. If Congress wants to prevent common law screenplays from entering into the public domain through publication of a motion picture, it can pass a law similar to H.R. 672.

Nor are we persuaded that § 2 of the 1909 Act works as a talisman to protect common law copyrights in this situation. Section 2 prevents the provisions of the 1909 Act from annulling or otherwise limiting common law copyright. 17 U.S.C. § 2 (repealed effective

---

would not infringe upon the screenplay's copyright. 209 U.S. at 18, 28 S.Ct. 319. So while Batjac's argument would win it the right to register, it would be a pyrrhic victory because it could not then use the copyright in the screenplay to control the motion picture. As in *La Cienega,* we decline to extend *White–Smith* to movie screenplays.

**15.** The 1909 Act explicitly excludes performances from being an event that constitutes publication. *See* 17 U.S.C. § 1(d) (repealed effective 1978). This rule was established to protect playwrights from having their productions copied through their performance.

1978). Our holding that § 7 is inapplicable, however, does not interfere with Batjac's common law copyright. It was not the 1909 Act, but rather Batjac's act of publication that "annul[led] or limit[ed]" Batjac's rights. Section 2 thus provides no comfort to Batjac.

As in *Harris,* Batjac controlled both the unpublished screenplay and the derivative motion picture. Batjac chose to publish the motion picture without separately seeking copyright protection for the screenplay. Having chosen to first publish in the medium of film, Batjac lost the right to again "first" publish those portions of the screenplay incorporated into the film.

AFFIRMED.