**Jefri AALMUHAMMED,
Plaintiff–Appellant,**

v.

**Spike LEE; Forty Acres and a Mule Filmworks, Inc.; By any Means Necessary Cinema, Inc.; Warner Brothers, a division of Time–Warner Entertainment LP; Victor Company of Japan Limited; Largo International N.V.; Largo Entertainment, Inc.; JCV Entertainment, Inc., Defendants–Appellees.**

No. 99–55224.

United States Court of Appeals,
Ninth Circuit.

Submitted April 19, 1999.[1]

Filed Feb. 4, 2000.

---

1. The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

 This dispute was originally submitted and argued on May 5, 1998 as 97–55403. However-

er, on October 29, 1998, that appeal was dismissed for want of jurisdiction. The District Court had entered a judgment that stated "The Court may amend or amplify this order with a more specific statement of the grounds

1228

for its decision." *National Distrib. Agency v. Nationwide Mutual Ins. Co.*, 117 F.3d 432 (9th Cir.1997), held that the identical language prevented review because "the court left open the possibility that the court might change its ruling," so no final judgment was entered.

On December 10, 1998, the District Court amended its order by removing that one sentence, thus making its order final. The parties then appealed the District Court's decision again. On April 19, 1999, this court granted appellant's motion to submit the case without oral argument, to take judicial notice of the briefs and excerpts filed in 97–55403, and to allow filing of letter briefs supplementing the earlier briefs.

Philip H. Stillman and Stephen S. Lux, Flynn, Sheridan, Tabb & Stillman, Del Mar, California, for the plaintiff-appellant.

Bruce Isaacs, Karen Brodkin & Jason A. Forge, Wyman, Isaacs, Blumenthal, & Lynne, Los Angeles, California, for the defendants-appellees.

Bruce P. Vann, Kelly, Lytton, Mintz & Vann, Los Angeles, California, for the defendants-appellees.

Before: CANBY, NOONAN, and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

This is a copyright case involving a claim of coauthorship of the movie *Malcolm X*. We reject the "joint work" claim but remand for further proceedings on a quantum meruit claim.

## I. FACTS

In 1991, Warner Brothers contracted with Spike Lee and his production companies to make the movie *Malcolm X*, to be based on the book, *The Autobiography of Malcolm X*. Lee co-wrote the screenplay, directed, and co-produced the movie, which starred Denzel Washington as Malcolm X. Washington asked Jefri Aalmuhammed to assist him in his preparation for the starring role because Aalmuhammed knew a great deal about Malcolm X and Islam. Aalmuhammed, a devout Muslim, was particularly knowledgeable about the life of Malcolm X, having previously written, directed, and produced a documentary film about Malcolm X.

Aalmuhammed joined Washington on the movie set. The movie was filmed in the New York metropolitan area and Egypt. Aalmuhammed presented evidence that his involvement in making the movie was very extensive. He reviewed the shooting script for Spike Lee and Den-

zel Washington and suggested extensive script revisions. Some of his script revisions were included in the released version of the film; others were filmed but not included in the released version. Most of the revisions Aalmuhammed made were to ensure the religious and historical accuracy and authenticity of scenes depicting Malcolm X's religious conversion and pilgrimage to Mecca.

Aalmuhammed submitted evidence that he directed Denzel Washington and other actors while on the set, created at least two entire scenes with new characters, translated Arabic into English for subtitles, supplied his own voice for voice-overs, selected the proper prayers and religious practices for the characters, and edited parts of the movie during post production. Washington testified in his deposition that Aalmuhammed's contribution to the movie was "great" because he "helped to rewrite, to make more authentic." Once production ended, Aalmuhammed met with numerous Islamic organizations to persuade them that the movie was an accurate depiction of Malcolm X's life.

Aalmuhammed never had a written contract with Warner Brothers, Lee, or Lee's production companies, but he expected Lee to compensate him for his work. He did not intend to work and bear his expenses in New York and Egypt gratuitously. Aalmuhammed ultimately received a check for $25,000 from Lee, which he cashed, and a check for $100,000 from Washington, which he did not cash.

During the summer before *Malcolm X*'s November 1992 release, Aalmuhammed asked for a writing credit as a co-writer of the film, but was turned down. When the film was released, it credited Aalmuhammed only as an "Islamic Technical Consultant," far down the list. In November 1995, Aalmuhammed applied for a copyright with the U.S. Copyright Office,

claiming he was a co-creator, co-writer, and co-director of the movie. The Copyright Office issued him a "Certificate of Registration," but advised him in a letter that his "claims conflict with previous registrations" of the film.

On November 17, 1995, Aalmuhammed filed a complaint against Spike Lee, his production companies, and Warner Brothers, (collectively "Lee"), as well as Largo International, N.V., and Largo Entertainment, Inc. (collectively "Largo"), and Victor Company of Japan and JVC Entertainment, Inc. (collectively "Victor"). The suit sought declaratory relief and an accounting under the Copyright Act. In addition, the complaint alleged breach of implied contract, quantum meruit, and unjust enrichment, and federal (Lanham Act) and state unfair competition claims. The district court dismissed some of the claims under Rule 12(b)(6) and the rest on summary judgment.

## II. ANALYSIS

### A. Copyright claim

Aalmuhammed claimed that the movie *Malcolm X* was a "joint work" of which he was an author, thus making him a co-owner of the copyright.[2] He sought a declaratory judgment to that effect, and an accounting for profits. He is not claiming copyright merely in what he wrote or contributed, but rather in the whole work, as a co-author of a "joint work."[3] The district court granted defendants summary judgment against Mr. Aalmuhammed's copyright claims. We review de novo.[4]

██ Defendants argue that Aalmuhammed's claim that he is one of the authors of a joint work is barred by the applicable statute of limitations. A claim of authorship of a joint work must be brought within three years of when it accrues.[5] Because creation rather than in-

---

**2.** 17 U.S.C. §§ 101, 201(a).

**3.** Cf. *Thomson v. Larson,* 147 F.3d 195, 206 (2nd Cir.1998).

**4.** See *Covey v. Hollydale Mobilehome Estates,* 116 F.3d 830, 834 (9th Cir.1997), *amended by,* 125 F.3d 1281 (1997).

**5.** See 17 U.S.C. § 507(b); *Zuill v. Shanahan,* 80 F.3d 1366, 1371 (9th Cir.1996), *cert. de-*

fringement is the gravamen of an authorship claim, the claim accrues on account of creation, not subsequent infringement, and is barred three years from "plain and express repudiation" of authorship.[6]

■ The movie credits plainly and expressly repudiated authorship, by listing Aalmuhammed far below the more prominent names, as an "Islamic technical consultant." That repudiation, though, was less than three years before the lawsuit was filed. The record leaves open a genuine issue of fact as to whether authorship was repudiated before that. Aalmuhammed testified in his deposition that he discussed with an executive producer at Warner Brothers his claim to credit as one of the screenwriters more than three years before he filed suit. Defendants argue that this discussion was an express repudiation that bars the claim. It was not. Aalmuhammed testified that the producer told him "there is nothing I can do for you," but "[h]e said we would discuss it further at some point." A trier of fact could construe that communication as leaving the question of authorship open for further discussion. That leaves a genuine issue of fact as to whether the claim is barred by limitations, so we must determine whether there is a genuine issue of fact as to whether Aalmuhammed was an author of a "joint work."

■ Aalmuhammed argues that he established a genuine issue of fact as to whether he was an author of a "joint work," *Malcolm X*. The Copyright Act does not define "author," but it does define "joint work":

> A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.[7]

"When interpreting a statute, we look first to the language."[8] The statutory language establishes that for a work to be a "joint work" there must be (1) a copyrightable work, (2) two or more "authors," and (3) the authors must intend their contributions be merged into inseparable or interdependent parts of a unitary whole. A "joint work" in this circuit "requires each author to make an independently copyrightable contribution" to the disputed work.[9] *Malcolm X* is a copyrightable work, and it is undisputed that the movie was intended by everyone involved with it to be a unitary whole. It is also undisputed that Aalmuhammed made substantial and valuable contributions to the movie, including technical help, such as speaking Arabic to the persons in charge of the mosque in Egypt, scholarly and creative help, such as teaching the actors how to pray properly as Muslims, and script changes to add verisimilitude to the religious aspects of the movie. Speaking Arabic to persons in charge of the mosque, however, does not result in a copyrightable contribution to the motion picture. Coaching of actors, to be copyrightable, must be turned into an expression in a form subject to copyright.[10] The same may be said for many of Aalmuhammed's other activities. Aalmuhammed has, however, submitted evidence that he rewrote several specific passages of dialogue that appeared in *Malcolm X*, and that he wrote scenes relating to Malcolm X's Hajj pilgrimage that were enacted in the movie. If Aalmuhammed's evidence is accepted, as it must be on summary judgment, these items would have been independently copyrightable.

---

nied, 519 U.S. 1090, 117 S.Ct. 763, 136 L.Ed.2d 710 (1997).

6. *Zuill*, 80 F.3d at 1371.

7. 17 U.S.C. § 101.

8. *Richardson v. United States*, 526 U.S. 813, 119 S.Ct. 1707, 1710, 143 L.Ed.2d 985 (1999).

9. *Ashton–Tate Corp. v. Ross*, 916 F.2d 516, 521 (9th Cir.1990).

10. *See Ashton–Tate Corp. v. Ross*, 916 F.2d 516, 521 (9th Cir.1990).

Aalmuhammed, therefore, has presented a genuine issue of fact as to whether he made a copyrightable contribution. All persons involved intended that Aalmuhammed's contributions would be merged into interdependent parts of the movie as a unitary whole. Aalmuhammed maintains that he has shown a genuine issue of fact for each element of a "joint work."

■ But there is another element to a "joint work." A "joint work" includes "two or more authors." [11] Aalmuhammed established that he contributed substantially to the film, but not that he was one of its "authors." We hold that authorship is required under the statutory definition of a joint work, and that authorship is not the same thing as making a valuable and copyrightable contribution. We recognize that a contributor of an expression may be deemed to be the "author" of that expression for purposes of determining whether it is independently copyrightable. The issue we deal with is a different and larger one: is the contributor an author of the joint work within the meaning of 17 U.S.C. § 101.

By statutory definition, a "joint work" requires "two or more authors."[12] The word "author" is taken from the traditional activity of one person sitting at a desk with a pen and writing something for publication. It is relatively easy to apply the word "author" to a novel. It is also easy to apply the word to two people who work together in a fairly traditional pen-and-ink way, like, perhaps, Gilbert and Sullivan. In the song, "I Am the Very Model of a Modern Major General," Gilbert's words and Sullivan's tune are inseparable, and anyone who has heard the song knows that it owes its existence to both men, Sir William Gilbert and Sir Arthur Sullivan, as its creative originator. But as the number of contributors grows and the work itself becomes less the product of one or two indi-

viduals who create it without much help, the word is harder to apply.

Who, in the absence of contract, can be considered an author of a movie? The word is traditionally used to mean the originator or the person who causes something to come into being, or even the first cause, as when Chaucer refers to the "Author of Nature." For a movie, that might be the producer who raises the money. Eisenstein thought the author of a movie was the editor. The "auteur" theory suggests that it might be the director, at least if the director is able to impose his artistic judgments on the film. Traditionally, by analogy to books, the author was regarded as the person who writes the screenplay, but often a movie reflects the work of many screenwriters. Grenier suggests that the person with creative control tends to be the person in whose name the money is raised, perhaps a star, perhaps the director, perhaps the producer, with control gravitating to the star as the financial investment in scenes already shot grows.[13] Where the visual aspect of the movie is especially important, the chief cinematographer might be regarded as the author. And for, say, a Disney animated movie like "The Jungle Book," it might perhaps be the animators and the composers of the music.

The Supreme Court dealt with the problem of defining "author" in new media in *Burrow–Giles Lithographic Co. v. Sarony*.[14] The question there was, who is the author of a photograph: the person who sets it up and snaps the shutter, or the person who makes the lithograph from it. Oscar Wilde, the person whose picture was at issue, doubtless offered some creative advice as well. The Court decided that the photographer was the author, quoting various English authorities: "the person who has superintended the arrangement, who has actually formed the picture by

**11.** 17 U.S.C. § 101.

**12.** 17 U.S.C. § 101.

**13.** *See* Richard Grenier, *Capturing the Culture*, 206–07 (1991).

**14.** *Burrow–Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 61, 4 S.Ct. 279, 28 L.Ed. 349 (1884).

putting the persons in position, and arranging the place where the people are to be—the man who is the effective cause of that"; " 'author' involves originating, making, producing, as the inventive or master mind, the thing which is to be protected"; "the man who really represents, creates, or gives effect to the idea, fancy, or imagination."[15] The Court said that an "author," in the sense that the Founding Fathers used the term in the Constitution,[16] was " 'he to whom anything owes its origin; originator; maker; one who completes a work of science or literature.' "[17]

Answering a different question, what is a copyrightable "work," as opposed to who is the "author," the Supreme Court held in *Feist Publications* that "some minimal level of creativity" or "originality" suffices.[18] But that measure of a "work" would be too broad and indeterminate to be useful if applied to determine who are "authors" of a movie. So many people might qualify as an "author" if the question were limited to whether they made a substantial creative contribution that that test would not distinguish one from another. Everyone from the producer and director to casting director, costumer, hairstylist, and "best boy" gets listed in the movie credits because all of their creative contributions really do matter. It is striking in *Malcolm X* how much the person who controlled the hue of the lighting contributed, yet no one would use the word "author" to denote that individual's relationship to the movie. A creative contribution does not suffice to establish authorship of the movie.

Burrow–Giles, in defining "author," requires more than a minimal creative or original contribution to the work.[19] *Burrow–Giles* is still good law, and was recently reaffirmed in *Feist Publications*.[20] *Burrow–Giles* and *Feist Publications* answer two distinct questions; who is an author, and what is a copyrightable work.[21] *Burrow–Giles* defines author as the person to whom the work owes its origin and who superintended the whole work, the "master mind."[22] In a movie this definition, in the absence of a contract to the contrary, would generally limit authorship to someone at the top of the screen credits, sometimes the producer, sometimes the director, possibly the star, or the screenwriter—someone who has artistic control. After all, in *Burrow–Giles* the lithographer made a substantial copyrightable creative contribution, and so did the person who posed, Oscar Wilde, but the Court held that the photographer was the author.[23]

The Second and Seventh Circuits have likewise concluded that contribution of independently copyrightable material to a work intended to be an inseparable whole will not suffice to establish authorship of a joint work.[24] Although the Second and Seventh Circuits do not base their decisions on the word "authors" in the statute,

---

**15.** *Id.* at 61, 4 S.Ct. 279 (quoting *Nottage v. Jackson*, 11 Q.B.D. 627 (1883)).

**16.** U.S. Const. Art. 1, § 8, cl. 8.

**17.** *Burrow–Giles,* 111 U.S. at 58, 4 S.Ct. 279 (quoting Worcester).

**18.** *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.,* 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

**19.** *Burrow–Giles Lithographic Co. v. Sarony,* 111 U.S. 53, 58, 4 S.Ct. 279, 28 L.Ed. 349 (1883).

**20.** *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.,* 499 U.S. 340, 346, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

**21.** *See Burrow–Giles Lithographic Co. v. Sarony,* 111 U.S. 53, 4 S.Ct. 279, 28 L.Ed. 349 (1884); *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.,* 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

**22.** *Burrow–Giles,* 111 U.S. at 61, 4 S.Ct. 279 (quoting *Nottage v. Jackson,* 11 Q.B.D. 627 (1883)).

**23.** *Id.* at 61, 4 S.Ct. 279.

**24.** *Thomson v. Larson,* 147 F.3d 195, (2nd Cir.1998); *Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061 (7th Cir.1994); *Childress v. Taylor,* 945 F.2d 500 (2d Cir.1991).

the practical results they reach are consistent with ours. These circuits have held that a person claiming to be an author of a joint work must prove that both parties intended each other to be joint authors.[25] In determining whether the parties have the intent to be joint authors, the Second Circuit looks at who has decision making authority, how the parties bill themselves, and other evidence.[26]

In *Thomson v. Larson,* an off-Broadway playwright had created a modern version of *La Boheme,* and had been adamant throughout its creation on being the sole author.[27] He hired a drama professor for "dramaturgical assistance and research," agreeing to credit her as "dramaturg" but not author, but saying nothing about "joint work" or copyright.[28] The playwright tragically died immediately after the final dress rehearsal, just before his play became the tremendous Broadway hit, *Rent.*[29] The dramaturg then sued his estate for a declaratory judgment that she was an author of *Rent* as a "joint work," and for an accounting.[30] The Second Circuit noted that the dramaturg had no decision making authority, had neither sought nor was billed as a co-author, and that the defendant entered into contracts as the sole author.[31] On this reasoning, the Second Circuit held that there was no intent to be joint authors by the putative parties and therefore it was not a joint work.[32]

■ Considering *Burrow–Giles,* the recent cases on joint works[33] (especially the thoughtful opinion in *Thomson v. Larson*[34] ), and the Gilbert and Sullivan example, several factors suggest themselves as among the criteria for joint authorship, in the absence of contract. First, an author "superintend[s]"[35] the work by exercising control.[36] This will likely be a person "who has actually formed the picture by putting the persons in position, and arranging the place where the people are to be-the man who is the effective cause of that," [37] or "the inventive or master mind" who "creates, or gives effect to the idea."[38] Second, putative coauthors make objective manifestations of a shared intent to be coauthors, as by denoting the authorship of *The Pirates of Penzance* as "Gilbert and Sullivan."[39] We say objective manifestations because, were the mutual intent to be determined by subjective intent, it could become an instrument of fraud, were one coauthor to hide from the other an intention to take sole credit for the work. Third, the audience appeal of the work turns on both contributions and "the share of each in its success cannot be appraised."[40] Control in many cases will be the most important factor.

**25.** *Thomson,* 147 F.3d at 202–05.

**26.** *Id.*

**27.** *Id.* at 197.

**28.** *Id.*

**29.** *Id.* at 198.

**30.** *Id.*

**31.** *Id.* at 202–04.

**32.** *Id.* at 202–24.

**33.** *See Thomson v. Larson,* 147 F.3d 195, (2nd Cir.1998); *Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061 (7th Cir.1994); *Childress v. Taylor,* 945 F.2d 500 (2nd Cir.1991).

**34.** *Thomson v. Larson,* 147 F.3d 195 (2nd Cir.1998).

**35.** *Burrow–Giles v. Sarony,* 111 U.S. at 61, 4 S.Ct. 279 (quoting *Nottage v. Jackson,* 11 Q.B. div. 627 (1883)).

**36.** *Thomson,* 147 F.3d at 202.

**37.** *Burrow–Giles v. Sarony,* 111 U.S. at 61, 4 S.Ct. 279 (quoting *Nottage v. Jackson,* 11 Q.B. Div. 627 (1883)).

**38.** *Id.*

**39.** *Cf. Thomson v. Larson,* 147 F.3d 195, 202 (2nd Cir.1998).

**40.** *Edward B. Marks Music Corp. v. Jerry Vogel Music Co., Inc.,* 140 F.2d 266, 267 (2nd Cir. 1944) (Hand, J.) *modified by,* 140 F.2d 268 (1944).

The best objective manifestation of a shared intent, of course, is a contract saying that the parties intend to be or not to be co-authors. In the absence of a contract, the inquiry must of necessity focus on the facts. The factors articulated in this decision and the Second and Seventh Circuit decisions cannot be reduced to a rigid formula, because the creative relationships to which they apply vary too much. Different people do creative work together in different ways, and even among the same people working together the relationship may change over time as the work proceeds.

Aalmuhammed did not at any time have superintendence of the work.[41] Warner Brothers and Spike Lee controlled it. Aalmuhammed was not the person "who has actually formed the picture by putting the persons in position, and arranging the place...."[42] Spike Lee was, so far as we can tell from the record. Aalmuhammed, like Larson's dramaturg, could make extremely helpful recommendations, but Spike Lee was not bound to accept any of them, and the work would not benefit in the slightest unless Spike Lee chose to accept them. Aalmuhammed lacked control over the work, and absence of control is strong evidence of the absence of co-authorship.

Also, neither Aalmuhammed, nor Spike Lee, nor Warner Brothers, made any objective manifestations of an intent to be coauthors. Warner Brothers required Spike Lee to sign a "work for hire" agreement, so that even Lee would not be a co-author and co-owner with Warner Brothers. It would be illogical to conclude that Warner Brothers, while not wanting to permit Lee to own the copyright, intended to share ownership with individuals like Aalmuhammed who worked under Lee's control, especially ones who at the time had made known no claim to the role of co-author. No one, including Aalmuhammed, made any indication to anyone prior to litigation that Aalmuhammed was intended to be a co-author and co-owner.

Aalmuhammed offered no evidence that he was the "inventive or master mind" of the movie. He was the author of another less widely known documentary about Malcolm X, but was not the master of this one. What Aalmuhammed's evidence showed, and all it showed, was that, subject to Spike Lee's authority to accept them, he made very valuable contributions to the movie. That is not enough for co-authorship of a joint work.

The Constitution establishes the social policy that our construction of the statutory term "authors" carries out. The Founding Fathers gave Congress the power to give authors copyrights in order "[t]o promote the progress of Science and useful arts."[43] Progress would be retarded rather than promoted, if an author could not consult with others and adopt their useful suggestions without sacrificing sole ownership of the work. Too open a definition of author would compel authors to insulate themselves and maintain ignorance of the contributions others might make. Spike Lee could not consult a scholarly Muslim to make a movie about a religious conversion to Islam, and the arts would be the poorer for that.

The broader construction that Aalmuhammed proposes would extend joint authorship to many "overreaching contributors,"[44] like the dramaturg in *Thomson*, and deny sole authors "exclusive authorship status simply because another person render[ed] some form of assistance."[45] Claimjumping by research assistants, editors, and former spouses, lovers and friends would endanger authors who talked with people about what they were

---

41. *See Burrow–Giles v. Sarony*, 111 U.S. 53, 61, 4 S.Ct. 279, 28 L.Ed. 349 (1883).

42. *Id.*

43. U.S. Const. Art. 1, § 8, cl. 8.

44. *Thomson*, 147 F.3d at 200 (internal quotations omitted).

45. *Id.* at 202 (citing *Childress v. Taylor*, 945 F.2d 500, 504 (1991)).

doing, if creative copyrightable contribution were all that authorship required.

■ Aalmuhammed also argues that issuance of a copyright registration certificate to him establishes a prima facie case for ownership. A prima facie case could not in any event prevent summary judgment in the presence of all the evidence rebutting his claim of ownership. "The presumptive validity of the certificate may be rebutted and defeated on summary judgment."[46] The Copyright Office stated in its response to Aalmuhammed's application for copyright (during the pendency of this litigation) that his claims "conflict with previous registration claims," and therefore the Copyright Office had "several questions" for him. One of the questions dealt with the "intent" of "other authors," i.e., Warner Brothers. The evidence discussed above establishes without genuine issue that the answers to these questions were that Warner Brothers did not intend to share ownership with Aalmuhammed.

Because the record before the district court established no genuine issue of fact as to Aalmuhammed's co-authorship of *Malcolm X* as a joint work, the district court correctly granted summary judgment dismissing his claims for declaratory judgment and an accounting resting on co-authorship.

## B. Quantum meruit

■ Aalmuhammed alleged in his complaint that defendants accepted his services, knowing that they were not being provided gratuitously, yet paid him neither the fair value of his services nor even his full expenses. He wrote script material, particularly for the important Islamic religious scenes, arranged with the Egyptians in charge of the mosque for the movie to be shot inside (Aalmuhammed is a Muslim and was the only Arabic-speaking person in the production crew), taught the actors how to pray as Muslims and directed the prayer scenes, and talked to Islamic authorities after the movie was made to assure their support when it was exhibited. These services were very important. The movie would be a dark tale of hate, but for the redemptive, uplifting Islamic religious scenes.

All the services were performed in New York and in Egypt (where the Hajj scenes were shot). Aalmuhammed's fifth, sixth and seventh claims articulated this claim variously as quasicontract, quantum meruit, and unjust enrichment. These claims are different from Aalmuhammed's claim to authorship of a joint work. Even though he was not an author, it is undisputed that he made a substantial contribution to the film. It may be that the producer or director, seeing that Aalmuhammed was performing valuable and substantial services and expending substantial amounts for travel and lodging, in the apparent expectation of reimbursement, had a duty to sign him up as an employee or independent contractor, obtain his acknowledgment that he was working gratuitously or perhaps for Denzel Washington, or eject him from the set.[47] We need not decide that, because the question on review is limited to which state's statute of limitations applies.

The defendants moved to dismiss these claims for failure to state a claim under Rule 12(b)(6), on the ground that the claims were barred by California's two year statute of limitations. Aalmuhammed argued that New York's six year statute of limitations applied. The district court granted the motion to dismiss, applying California's shorter statute.

The parties agree that the district court correctly used law of the forum, California,

---

**46.** *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1086 (9th Cir.1989).

**47.** *See* 2 George E. Palmer, *Law of Restitution* § 10.11, at 463 (1978) ("When the plaintiff voluntarily submits an idea to the defendant which the defendant uses to his economic advantage, without any express agreement to pay the plaintiff for such use, . . . the plaintiff will be able [in some circumstances] to recover the reasonable value of the use of the idea in a contract action.").

as the source of its rule for choice of law. The applicable rule required, in this case, that "the court must apply the law of the state whose interest would be more impaired if its law were not applied."[48]

Defendants argue that only California had an interest in the application of its statute of limitations, not New York. Their theory is that the defendant corporations have their principal places of business in California, Aalmuhammed resided in neither state (he lives in Florida, though he spent the months of shooting time in New York and Egypt), and Aalmuhammed filed his lawsuit in California.

The defense argument is unpersuasive. The question is which state's interest would suffer more by the application of the other's law.[49] The strength of the interest is also a factor, however.[50] California's interest in protecting its residents from stale claims arising from work done outside the state is a weak one: "[t]he residence of the parties is not the determining factor in a choice of law analysis."[51] New York's interest in governing the remedies available to parties working in new York is far more significant.[52] New York's connection with Aalmuhammed's claim is considerably more substantial, immediate and concrete than California's. We conclude that New York would suffer more damage to its interest if California law were applied than would California if New York law were applied.

Because New York has the stronger interest and would suffer more damage than

California if its law were not applied, New York's six year statute of limitations governs. The claims were brought within six years of when they accrued. We therefore vacate the dismissal of Aalmuhammed's implied contract, quantum meruit, and unjust enrichment claims and remand them for further proceedings.

## C. Unfair competition

■ Aalmuhammed claimed that defendants passed off his scriptwriting, directing and other work as that of other persons, in violation of the Lanham Act[53] and the California statute prohibiting unfair competition.[54] The dismissal was under Rule 12(b)(6), for failure to state a claim upon which relief can be granted, so we review *de novo*,[55] on the basis of allegations in the complaint.[56]

■ We have held that, at least in some circumstances, failure to give appropriate credit for a film is "reverse palming off" actionable under the Lanham Act.[57] And we have held that "actions pursuant to California Business and Professions Code § 17200 are substantially congruent to claims made under the Lanham Act."[58] Defendants argue that not enough of Aalmuhammed's proposed script was used verbatim to amount to a violation. But this argument goes to the evidence, not the complaint, so it cannot sustain the 12(b)(6) dismissal. The complaint alleged that Aalmuhammed "substantially rewrote and expanded the dialogue for various entire

**48.** *Waggoner v. Snow, Becker, Kroll, Klaris & Krauss,* 991 F.2d 1501, 1507 (9th Cir.1993) (citing *Ledesma v. Jack Stewart Produce, Inc.,* 816 F.2d 482, 484 (9th Cir.1987)).

**49.** *Waggoner v. Snow, Becker, Kroll, Klaris & Krauss,* 991 F.2d 1501, 1507 (9th Cir.1993) (citing *Ledesma v. Jack Stewart Produce, Inc.,* 816 F.2d 482, 484 (9th Cir.1987)).

**50.** *Id.*

**51.** *Id.*

**52.** *See Rosenthal v. Fonda,* 862 F.2d 1398, 1403 (9th Cir.1988).

**53.** 15 U.S.C. §§ 1117, 1125.

**54.** Cal. Bus. & Prof.Code § 17203.

**55.** *See Cohen v. Stratosphere Corp.,* 115 F.3d 695, 700 (9th Cir.1997).

**56.** *See Campanelli v. Bockrath,* 100 F.3d 1476, 1479 (9th Cir.1996).

**57.** *Smith v. Montoro,* 648 F.2d 602, 607 (9th Cir.1981); *See also Lamothe v. Atlantic Recording Corp.,* 847 F.2d 1403, 1406–07 (9th Cir.1988).

**58.** *Cleary v. News Corp.,* 30 F.3d 1255, 1262–63 (9th Cir.1994).

scenes" and otherwise alleged extensive and substantial use of his work in the final movie. We need not determine whether Aalmuhammed established a genuine issue of fact regarding unfair competition, because the claim never got as far as summary judgment in the district court. We reverse the dismissal of these two claims.

### D. Conduct abroad

 The district court dismissed Aalmuhammed's claims against the Largo defendants under Rule 12(b)(6) for failure to state a claim. The dismissal was based on our decision in *Subafilms,* that acts of copyright infringement that occur wholly outside of the United States are not actionable under the U.S. Copyright Act.[59]

The complaint does not say whether the Largo defendants' conduct occurred outside the United States. Defendants argue that it does, by referring to them as "the film's foreign distributors." But it also says that their principal place of business is in California. These allegations leave room for proof that the conduct that the Largo defendants engaged in took place within California, even though it had consequences abroad. We cannot tell from the complaint whether foreign distributors do their work in foreign countries, or do it by fax, phone, and email from California. We therefore reverse the dismissal based on extraterritoriality of the claims against the Largo defendants.

AFFIRMED in part, REVERSED and REMANDED in part. Each party to bear its own costs.

**59.** *See Subafilms, Ltd. v. MGM–Pathe Communications,* 24 F.3d 1088, 1095–96 (9th Cir. 1994) (en banc).