KOZINSKI, Circuit Judge,
dissenting:
Garcia’s dramatic performance met all of the requirements for copyright protection: It was copyrightable subject matter, it was original and it was fixed at the moment it was recorded. So what happened to the copyright? At times, the majority says that Garcia’s performance was not copyrightable at all. And at other times, it seems to say that Garcia just didn’t do enough to gain a copyright in the scene. Either way, the majority is wrong and makes a total mess of copyright law, right here in the Hollywood Circuit. In its haste to take internet service providers off the hook for infringement, the court'today robs performers and other creative talent of rights Congress gave them. I won’t be a party to it.
I
Youssef handed Garcia a script. Garcia performed it. Youssef recorded Garcia’s performance on video and saved the clip. Until today, I understood that the rights in such a performance are determined according to elementary copyright principles: An “original work[] of authorship,” 17 U.S.C. § 102(a), requires only copyrightable subject matter and a “minimal degree of creativity.” Feist Publ’ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). The work is “fixed” when it is “sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.” 17 U.S.C. § 101. And at that moment, the “author or authors of the work” instantly and automatically acquire a copyright interest in it. 17 U.S.C. § 201(a). This isn’t exactly String Theory; more like Copyright 101.
Garcia’s performance met these minimal requirements; the majority doesn’t contend otherwise. The majority nevertheless holds that Garcia’s performance isn’t a “work,” apparently because it was created during the production of a later-assembled film, Innocence of Muslims. Maj. Op. 741-43. But if you say something is not a work, it means that ,it isn’t copyrightable by anyone. Under the majority’s definition of “work,” no one (not even Youssef) can claim a copyright in any part of Garcia’s performance, even though it was recorded several months before Innocence of Muslims was assembled. Instead, Innocence of Muslims — the ultimate film — is the only thing that can be a “work.” If this is what my colleagues are saying, they are casting doubt on the copyrightability of vast swaths of material created during production of a film or other composite work.
*750 The implications are daunting. If Garcia’s scene is not a work, then every take of every scene of, say, Lord of the Rings is not a work, and thus not protected by copyright, unless and until the clips become part of the final movie. If some dastardly crew member were to run off with a copy of the Battle of Morannon, the dastard would be free to display it for profit until it was made part of the final movie. And, of course, the take-outs, the alternative scenes, the special effects never used, all of those things would be fair game because none of these things would be “works” under the majority’s definition. And what about a draft chapter of a novel? Is there no copyright in the draft chapter unless it gets included in the published book? Or if part of the draft gets included, is there no copyright in the rest of it?
This is a remarkable proposition, for which the majority provides remarkably little authority. Aalmuhammed v. Lee, 202 F.3d 1227 (9th Cir.2000), the only case that the majority cites, says just the opposite. In Aalmuhammed, we considered a claim by a contributor to the movie Malcolm X that he was a joint author of the entire movie. Id. at 1230. Everyone in Aalmuhammed agreed that the relevant “work” was Malcolm X. The only question was whether the contributor was a joint author of that work. We went out of our way to emphasize that joint authorship of a movie is a “different question” from whether a contribution to the movie can be a “work” under section 102(a). Id. at 1233. And we clearly stated that a contribution to a movie can be copyrightable (and thus can be a “work”). Id. at 1232.
The majority’s newfangled definition of “work” is directly contrary to a quarter-century-old precedent that has never been questioned, Effects Associates, Inc. v. Cohen, 908 F.2d 555 (9th Cir.1990). There, we held that a company that created special effects footage during film production retained a copyright interest in the footage even though it became part of the film. Id. at 556-58; see also Oddo v. Ries, 743 F.2d 630, 633-34 (9th Cir.1984). The majority tries to distinguish Effects Associates by arguing that the footage there was a “standalone work[ ] that [was] separately fixed and incorporated into a film.” Maj Op. 744 n. 13. But Garcia’s performance was also “separately fixed and incorporated into” Innocence of Muslims. Why then are the seven shots “featuring great gobs of alien yogurt oozing out of a defunct factory” interspersed in The Stuff, 908 F.2d at 559, any more a “standalone work” than Garcia’s performance? Youssef wasn’t required to use any part of Garcia’s performance in the film; he could have sold the video clip to someone else. The clip might not have had much commercial value, but neither did the special effects scenes in Effects Associates. Nothing in the Copyright Act says that special effects scenes are “works” entitled to copyright protection but other scenes are not. And what about scenes that have actors and special effects? Are those scenes entitled to copyright protection (as in Effects Associates ), or are they denied copyright protection like Garcia’s scene?
II
A. The majority also seems to hold that Garcia is not entitled to copyright protection because she is not an author of the recorded scene. According to the majority, Garcia can’t be an author of her own scene because she “played no role in [her performance’s] fixation.” Maj. Op. 744.
But a performer need not operate the recording equipment to be an author of his own performance. See H.R.Rep. No. 94-1476, at 56 (1976); S.Rep. No. 94-473, at 53-54 (1975); see also 1 Nimmer on Copy *751 right § 2.10[A][3] at 2-178.4 to 2-178.5. Without Garcia’s performance, all that existed was a script. To convert the script into a video, there needed to be both an actor physically performing it and filmmakers recording the performance. Both kinds of activities can result in copyrightable expression. See 1 Nimmer on Copyright § 2.09[F] at 2-165 to 2-171 (discussing Baltimore Orioles, Inc. v. Major League Baseball Players Ass’n, 805 F.2d 663 (7th Cir.1986)).[1] Garcia’s performance had at least “some minimal degree of creativity” apart from the script and Youssefs direction. See Feist, 499 U.S. at 345, 111 S.Ct. 1282. One’s “[pjersonality always contains something unique. It expresses its singularity even in handwriting, and a very modest grade of art has in it something which is one man’s alone.” Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 250, 23 S.Ct. 298, 47 L.Ed. 460 (1903). To dispute this is to claim that Gone With the Wind would be the same movie if Rhett Butler were played by Peter Lorre.
Actors usually sign away their rights when contracting to do a movie, but Garcia didn’t and she wasn’t Youssefs employee. I’d therefore find that Garcia acquired a copyright in her performance the moment it was fixed. When dealing with material created during production of a film or other composite work, the absence of a contract always complicates things. See Effects Associates, 908 F.2d at 556 (“Moviemakers do lunch, not contracts.”). Without a contract the parties are left with whatever rights the copyright law gives them. It’s not our job to take away from performers rights Congress gave them. Did Jimi Hendrix acquire no copyright in the recordings of his concerts because he didn’t run the recorder in addition to playing the guitar? Garcia may not be as talented as Hendrix — who is?— but she’s no less entitled to the protections of the Copyright Act.
B. While the Copyright Office claims that its “longstanding practices” don’t recognize Garcia’s copyright interest, it doesn’t seem that the Register of Copyrights got the memo. The Register was a member of the U.S. delegation that signed the Beijing Treaty on Audiovisual Performances. See U.S. Copyright Office, Annual Report of the Register of Copyrights 8 (2012). The Treaty would recognize Garcia’s rights in her performance. It provides that “performers” have the “exclusive right of authorizing ... the fixation of their unfixed performances,” and “reproduction of their performances fixed in audiovisual fixations, in any manner or form.” World Intellectual Property Organization, Beijing Treaty on Audiovisual Performances, Art. 6(ii), 7 (2012).
The Patent Office, which led the delegation, states that U.S. law is “generally compatible” with the Treaty, as “actors and musicians are considered to be ‘authors’ of their performances providing them with copyright rights.” U.S. Patent & Trademark Office, Background and Summary of the 2012 WIPO Audiovisual Performances Treaty 2 (2012). Although *752 the Copyright Office hasn’t issued a statement of compatibility, it’s hard to believe that it would sign on if it believed that the Treaty’s key provisions are inconsistent with U.S. copyright law. In fact, the Copyright Office praised the Treaty as “an important step forward in protecting the performances of television and film actors throughout the world.” U.S. Copyright Office, NewsNet: Beijing Audiovisual Performances Treaty (2012), http:// copyright.gov/newsneV2012/460.html. Except in the Ninth Circuit.
The Copyright Office’s position is thus inconsistent at best. And, in any event, neither the Copyright Office’s reasoning nor the authority it relies on in its letter to Garcia fare any better than the majority’s. The Copyright Office would refuse copyright registration to an actor like Garcia because “an actor or an actress in a motion picture is either a joint author in the entire work or, as most often is the case, is not an author at all by virtue of a work made for hire agreement.” However, Garcia isn’t a joint author of the entire movie and didn’t sign any agreements. She doesn’t fit into either category. Like the majority, the Copyright Office would wish this problem away by refusing registration unless the copyright claimant personally recorded his performance. But nothing in the legislative history relied on by the Copyright Office (which concerned joint authorship of an entire film) suggests that a non-employee doesn’t retain any copyright interest in a video clip , of his acting performance because it’s recorded by the film’s producer. See H.R.Rep. No. 94-1476, at 120.
Ill
The harm the majority fears would result from recognizing performers’ copyright claims in their fixed, original expression is overstated. The vast majority of copyright claims by performers in their contributions are defeated by a contract and the work for hire doctrine. See 1 Nimmer on Copyright § 6.07[B][2] at 6-28 to 6-29; 2 William F. Patry, Patry on Copyright § 5:17 (2010). And most of the performers that fall through the cracks would be found to have given an implied license to the film’s producers to use the contribution in the ultimate film. See Effects Associates, 908 F.2d at 558. Very few performers would be left to sue at all, and the ones that remain would have to find suing worth their while. They wouldn’t be able to claim the valuable rights of joint authorship of the movie, such as an undivided share in the movie or the right to exploit the movie for themselves. See 1 Nimmer on Copyright § 6.08 at 6-34 to 636. Rather, their copyright claims would be limited to the original expression they created. See Aalmuhammed, 202 F.3d at 1232; Effects Associates, 908 F.2d at 559. Which is why filmmaking hasn’t ground to a halt even though we held a quarter-century ago that “where a non-employee contributes to a book or movie, ... the exclusive rights of copyright ownership vest in the creator of the contribution, unless there is a written agreement to the contrary.” Effects Associates, 908 F.2d at 557.
Regardless, the Supreme Court has reminded us that “speculation about future harms is no basis for [courts] to shrink authorial rights.” N.Y. Times Co. v. Tasini, 533 U.S. 483, 505-06, 121 S.Ct. 2381, 150 L.Ed.2d 500 (2001). In Tasini freelance authors argued that the inclusion in databases of their articles that originally appeared in periodicals infringed their copyrights in the works. Id. at 487, 121 S.Ct. 2381. Publishers warned that “ ‘devastating’ consequences,” including massive damages awards, would result if the Court were to hold for the freelancers. Id. at 504, 121 S.Ct. 2381. The Court nonethe *753 less held for the freelancers, turning back the parade of horribles deployed by the publishers. The Court explained that there are “numerous models for distributing copyrighted works and remunerating authors for their distribution.” Id. at 504-05, 121 S.Ct. 2381. Tasini is a powerful reminder that movie producers, publishers and distributors will always claim that the sky is falling in cases that might recognize an individual contributor’s copyright interest in material he created.[2] They will always say, as Google says here, that holding in the contributor’s favor will make “Swiss cheese” of copyrights. Maj. Op. 742.
But under our copyright law, the creators of original, copyrightable material automatically acquire a copyright interest in the material as soon as it is fixed. There’s no exception for material created during production of a film or other composite work. When modern works, such as films or plays, are produced, contributors will often create separate, copyrightable works as part of the process. Our copyright law says that the copyright interests in this material vest initially with its creators, who will then have leverage to obtain compensation by contract. The answer to the “Swiss cheese” bugbear isn’t for courts to limit who can acquire copyrights in order to make life simpler for producers and internet service providers. It’s for the parties to allocate their rights by contract. See Effects Associates, 908 F.2d at 557. Google makes oodles of dollars by enabling its users to upload almost any video without pre-screening for potential copyright infringement. Google’s business model, like that of the database owners in Tasini, assumes the risk that a user’s upload infringes someone else’s copyright, and sthat it may have to take corrective action if a copyright holder comes forward.
The majority credits the doomsday claims at the expense of property rights that Congress created. Its new standard artificially shrinks authorial rights by holding that a performer must personally record his creative expression in order to retain any copyright interest in it, speculating that a contrary rule might curb filmmaking and burden.the internet. But our injunction has been in place for over a year; reports of the internet’s demise have been greatly exaggerated. For the reaT sons stated here and in the majority opinion in Garcia v. Google, Inc., 766 F.3d 929, 933-36 (9th Cir.2014), I conclude that Garcia’s copyright claim is likely to succeed. I’d also find that Garcia has made an ample showing of irreparable harm. It’s her life that’s at stake. See id. at 938-39.

. Professor Nimmer agrees with the first premise of Baltimore Orioles, namely, that a contributor of a copyrightable expression that’s captured on video may retain a copyright interest in it. 1 Nimmer on Copyright § 2.09[F] at 2-166. That’s because both the underlying human activity and the creative aspects of the video itself may be copyrightable. Id. Professor Nimmer disagrees with the Seventh Circuit’s decision in Baltimore Orioles on the basis that the underlying human activity in that case (the baseball game) didn’t contain any creative elements. 1 id. § 2.09[F] at 2-167 to 2-171. But Garcia's acting performance is clearly copyrightable subject matter. See Laws v. Sony Music Entm’t, Inc., 448 F.3d 1134, 1142 (9th Cir.2006) (citing Fleet v. CBS, Inc., 50 Cal.App.4th 1911, 58 Cal.Rptr.2d 645, 651 (1996)); 1 Nimmer on Copyright § 2.09[F] at 2-170 n. 85.

. Ditto in Community for Creative Non-Violence v. Reid, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), which concerned the scope of a “work made for hire.” Id. at 738, 109 S.Ct. 2166. Amici representing, among others, publishers and technology companies advocated for a broad definition of "employee." They predicted “ever-increasing interference with the dissemination of creative works” if the Court didn’t adopt their definition of "employee.” Brief of the Computer & Business Equipment Manufacturers’ Ass'n et al. in Support of Petitioners at 4-5, Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) (No. 88-293). But the Court adopted the narrower definition of "employee” used in agency law. Reid, 490 U.S. at 750-51, 109 S.Ct. 2166. It appears that creative works have been disseminating just fine in spite of Reid.