STV's assertion is not supported by any evidence concerning Mallet's assignments and is therefore insufficient to raise a genuine dispute. There is also no evidence to raise a genuine dispute that Morphos's assignments were obtained by fraud; there is no evidence that a misrepresentation was made.[12] Morphos declares that he assumed he was signing a renewal of assignment of rights but that no one told him it was a renewal. Morphos Dep. Tr. at 87:21-25-88:1-12. The assignments are unambiguous as to the rights they confer and to what entity they are assigned. See Morphos Dep., Ex. 11. There is no evidence that Morphos was misled into signing the assignments.
STV has not provided sufficient evidence to create a genuine dispute of material fact that Morphos's or Mallet's assignments are invalid because they were procured by fraud.
C. Joint Author
STV asserts the motion should be denied because STV is a joint author of the Works. Opp'n at 17-18.[13]
"[C]opyright ownership vests initially in the author or authors of the work, which is generally the creator of the copyrighted work." U.S. Auto Parts Network, Inc. v. Parts Geek, LLC, 692 F.3d 1009, 1015 (9th Cir. 2012) (citation and internal quotation marks omitted). "A 'joint work' is a work prepared by two or more authors with the intention that their *1141 contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. Being an author requires more than making a creative contribution, even a "valuable and copyrightable" one. Aalmuhammed v. Lee, 202 F.3d 1227, 1232 (9th Cir. 2000). An author must have "superintended the whole work," acting as the "master mind" with "creative control." Id. at 1233 (quoting Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 61, 4 S.Ct. 279, 28 L.Ed. 349 (1884) ). The parties do not dispute that each of the Works is a "unitary work" within the meaning of 17 U.S.C. § 101. See Opp'n at 16; Reply at 11. The issue is whether STV's involvement amounted to co-authorship of the Works.
The Ninth Circuit set forth three criteria for determining whether a work is jointly authored under § 101 :
First, [the Court] determine[s] whether the 'putative coauthors ma[de] objective manifestations of a shared intent to be coauthors.' A contract evidencing intent to be or not to be coauthors is dispositive. Second, [the Court] determines whether the alleged author superintended the work by exercising control. Control will often be the most important factor. Third, [the Court] analyze[s] whether 'the audience appeal of the work' can be attributed to both authors, and whether 'the share of each in its success cannot be appraised.'
Richlin v. Metro-Goldwyn-Mayer Pictures, Inc., 531 F.3d 962, 968 (9th Cir. 2008) (quoting Aalmuhammed, 202 F.3d at 1234 ).
1. STV's Contribution in Music and Passion: Live
The facts here, viewed in the light most favorable to STV, are insufficient to demonstrate that STV was a coauthor of Music and Passion: Live. STV was one of the producers of Music and Passion: Live. SGIMF ¶¶ 44 (citing Morphos Dep. Tr. 12:9-20). Queen was in charge of logistics of producing the DVD version of Music and Passion: Live and PBS-specific filming and also was in charge of the budget. See id. ¶ 174; Queen Decl. ¶¶ 32-33. Queen worked with Morphos and others on the camera plots, budgeting, credits, seating, travel and setlist for the show. Queen Decl. ¶¶ 32-33; Morphos Dep. Tr. at 94-13 (Morphos stating that he presented Queen with the budget). Grove brought his own materials to film behind the scenes footage of the concert Music and Passion before the show was available to the public. SGIMF ¶ 173 (citing Grove Dep. Tr. at 53:11-57:3). This footage was included in the PBS television special and DVD version (but not the international DVD). Id. at 54:22; 56: 17-24. Grove also filmed interviews with Manilow about the show. Id. 56:1-6. This footage was only included in the DVD version. Id. [14] Grove was involved in editing the film. SGIMF ¶ 49.
The evidence of STV's involvement in Music and Passion: Live is insufficient to establish it as a joint author absent an agreement. The parties agree that Manilow created the concert Music and Passion, and that no material changes to it were made when it was filmed. SGIMF ¶ 39. The parties also agree that Mallet directed the concerts that were recorded for Music and Passion: Live and ran production of the filming. SGIMF ¶¶ 40, 43. There is no contract or agreement evincing an intention for STV to coauthor Music and Passion: Live with Manilow or Mallet, and STV's involvement amounts to operating logistics, financing, behind the scene footage, *1142 and assistance in editing. There are no citations to testimony or other evidence that either Grove or Queen had artistic control over Music and Passion: Live and their contributions fall short of being a "master mind" of the work. See Aalmuhammed, 202 F.3d at 1234 (plaintiff's substantial and valuable contributions to film, including rewriting certain scenes, directing religious aspects of the movie, and providing technical help insufficient to establish authorship).
2. STV's Contribution to Songs from the Seventies
Viewing the facts most favorably to STV, STV's contributions to Songs from the Seventies involved pitching the project and negotiating the agreement with PBS, hiring the production crew and director, securing the location of the shoot, and coordinating logistics of the show. Opp'n at 9 (citing SGIMF ¶¶ 90, 93, 96, 99, 100, 103, 104). It was also involved in the financial and business aspect of the production, provided feedback, and oversaw important aspects of editing. SGIMF ¶ 100.
It is undisputed, however, that Manilow created and controlled the choreography and set list recorded for Songs from the Seventies. Id. (citing Grove Dep. Tr. at 230:24-231:19; 233:1-20; 234:18-235:1). That Manilow exercised ultimate control and authority over the work is evidenced by his rejection of the initial version filmed, and that he required substantial edits to be made. Id. ¶ 105. Manilow's dictates were followed and led to an intensive postproduction edit. Id. It is also undisputed that Mallet led the part of postproduction in the United Kingdom. Id. ¶ 106. While Grove and Queen were also involved in editing, Grove testified that they would show Manilow the edits for his approval. See Grove Dep. Tr. at 245:11-20. Grove's testimony is replete with references to Manilow and the control he had over the ultimate product, including postproduction edits. The parties do not dispute this testimony. SGIMF ¶ 100 (citing Grove Dep. Tr. at 230:24-231:19; 233:1-20; 234:18-235:1).
There is no contract or writing manifesting an intention to coauthor Songs from the Seventies. The undisputed evidence shows that Manilow was the master mind of the work, and at most, shared authorship with Mallet. There is no cited evidence that STV had artistic control. Though STV's contributions were clearly valuable, valuable contributions (even copyrightable contributions) are not sufficient to create authorship. See Aalmuhammed, 202 F.3d at 1234,
STV has not provided sufficient evidence to create a genuine dispute of material fact that it is a coauthor of Songs from the Seventies.
D. Work Made for Hire and Copyright Transfer
Copyright ownership normally vests in the creator of the work. See U.S. Auto Parts Network, Inc., 692 F.3d at 1015. But if a work is a work made for hire, "the employer or other person for whom the work was prepared is considered the author ..., and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b). A "work made for hire" is either "a work prepared by an employee within the scope of his or her employment; or a work specially ordered or commissioned for use as a contribution to a collective work ... if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101.
*1143 1. Music and Passion: Live
Regarding Music and Passion: Live , STV asserts that PJM hired Mallet and STV hired PJM.[15] Opp'n at 19. STV contends it entered into a production agreement with PJM that assigned to STV all rights and interests of the individuals PJM engaged. Id. Because PJM engaged Mallet, STV argues that pursuant to the production agreement, it acquired Mallet's copyright interests in Music and Passion: Live. Id.
But PJM cannot assign interests it does not own, and hiring alone is insufficient to confer copyright interests under the work made for hire doctrine. 17 U.S.C. § 101. For Mallet's work to qualify as a work made for hire, Mallet would have needed to execute an express agreement in writing that the work is a work made for hire by the entity that hired him-PJM.[16] Id.; Opp'n at 19 ("Mallet and Serpent were hired by Paul Morphos of PJM."). His work must also have been specially commissioned "for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas." 17 U.S.C. § 101. There is no citation to a written, executed agreement in the record between PJM and Mallet stating that Mallet's work on Music and Passion: Live was a work made for hire or testimony that one ever existed.
If Mallet's work was not a work made for hire, a written agreement is still necessary for Mallet to transfer his copyright ownership to PJM. Id. § 204(a); Corbello v. DeVito, 777 F.3d 1058, 1062 (9th Cir. 2015). There is also no citation to any writing evincing Mallet's intent to transfer his copyright ownership to PJM or STV.[17]
In the record is an unsigned draft production agreement between PJM and STV dated January 12, 2006. Morphos Dep., Ex. 8. It assigns to STV all rights, title, and interests of any persons engaged by PJM. Id. § 5.1. Also in the record is a November 5, 2005 deal memo signed by STV and PJM, stating that STV is the owner of the "certain music special entitled 'Barry Manilow: Music and Passion." Morphos Dep., Ex. 13 (deal memo). The parties dispute whether an executed version of the production agreement exists and whether the deal memo is sufficient to confer STV ownership of PJM's copyright interest in Music and Passion: Live. This dispute misses the mark. Because there is no evidence that Mallet ever transferred his interests to PJM or that Mallet's work was a work made for hire, PJM did not own Mallet's copyright interests and could not have assigned them to STV.
STV has not submitted sufficient evidence to raise a genuine dispute of material fact that it acquired Mallet's copyright *1144 interest in Music and Passion: Live either through assignment or work made for hire.
2. Songs from the Seventies
STV asserts that it commissioned Mallet's and Morphos's work directly on Songs from the Seventies as a work made for hire. There is no citation to executed agreements in the record between STV and Mallet or STV and Morphos for their work on Songs from the Seventies. There is no cited testimony that either Mallet or Morphos entered into a written work made for hire agreement with STV.[18]
STV has not raised a genuine dispute of material fact that Mallet's and Morphos's work on Songs from the Seventies was work made for hire.
IV. Conclusion
HCT's motion for summary judgment is GRANTED. Its request for declaratory relief filed together with the motion is denied.
In its Answer, HCT prays for "its costs and attorneys' fees pursuant to, inter alia , 17 U.S.C. § 505." The parties are ordered to meet and confer no later than June 24, 2019 to discuss HCT's entitlement to fees under the appropriate standard, and if so, the amount. In the absence of an agreement as to entitlement, HCT is ordered to file a brief not to exceed 10 pages supporting its entitlement to fees no later than July 3. STV may file an opposition not to exceed 10 pages no later than July 10. A reply of no more than 5 pages may be filed no later than July 17. If the Court determines that HCT is entitled to fees, it will set a separate briefing schedule as to the amount to be awarded.
IT IS SO ORDERED.

The testimony cited by STV in SGIMF ¶ 107 does not support the assertion that Morphos' assignment was procured by fraud.

Even if STV could demonstrate a genuine dispute of material fact on this subject, STV's claim for declaratory relief that it is the sole author of each of the Works cannot survive summary judgment.

STV contends that Grove was involved in the lighting work for production of the filming of the concert. Opp'n at 6 (citing SGIMF ¶¶ 39, 40). None of the cited testimony or evidence supports this contention and some of the evidence is completely unrelated.

STV does not assert it entered into a work for hire agreement with Manilow. SGIMF ¶ 55.

The Court analyzes only the second prong of the work made for hire doctrine because the parties do not contend that Mallet was an employee of PJM, and there is no evidence in the record that Mallet was PJM's employee.

STV contends that at his deposition, "Morphos also testified that he entered into an agreement with Mallet." Opp'n at 19 (citing SGIMF ¶¶ 35, 36, and 57). The statement is not supported by any evidence. Paragraph 35 provides multiple citations to multiple pages of Morphos's deposition testimony, none of which discusses an agreement with Mallet. Morphos testifies to entering into an oral partnership agreement with Serpent in 2002, but mentions no written agreement. Morphos Dep. Tr. at 103:2-18. Paragraphs 36 and 57 do not cite any testimony by Morphos other than that they reference paragraph 35.

STV cites to SGIMF ¶¶ 91, 92, 93 to support its contention that Morphos and Mallet were hired directly by STV. Opp'n at 8; 20. The evidence cited in those paragraphs either does not discuss written agreements or is not filed with the Court. There is no cited evidence for the proposition that "STV commissioned Paul Morphos's work directly as a work for hire in the context of a motion picture." Id. at 20.