**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRADLEY RICHLIN; LANCE RICHLIN;
MARK MANNIS; ABIGAIL RICHLIN
SCHWARTZ,
　　　　*Plaintiffs-Appellants,*

LOUISE RICHLIN; ELYSSA PARTON;
MICHELLE FORKEL,
　　　　*Nominal Defendants and
Involuntary Plaintiffs-Appellants,*

v.

METRO-GOLDWYN-MAYER PICTURES,
INC.; GEOFFREY PRODUCTIONS, INC.,
　　　　*Defendants-Appellees.*

No. 06-55307

D.C. No.
CV-04-09162-DDP

OPINION

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted
October 15, 2007—Pasadena, California

Filed June 19, 2008

Before: Ferdinand F. Fernandez and Kim McLane Wardlaw,
Circuit Judges, and Raner C. Collins,* District Judge.

Opinion by Judge Wardlaw

---

*The Honorable Raner C. Collins, United States District Judge for the
District of Arizona, sitting by designation.

7229

## COUNSEL

E. Randol Schoenberg, Laura A. Gibbons, Burris & Schoenberg, LLP, Los Angeles, California; Thomas A. Brackey, Freund & Brackey LLP, Beverly Hills, California, for the plaintiffs-appellants, and nominal defendants and involuntary plaintiffs-appellants.

Jonathan Zavin, Jacques M. Rimokh, Loeb & Loeb LLP, New York, New York; David Grossman, Loeb & Loeb LLP, Los Angeles, California, for the defendants-appellees.

---

## OPINION

WARDLAW, Circuit Judge:

Inspector Jacques Clouseau, famously unable to crack the simplest of murder cases, would most certainly be confounded by the case we face. While Inspector Clouseau searched for the answer to the question, "Who did it?", we must search for the answer to the question, "Who owns it?" In 1962, Maurice Richlin coauthored a story treatment (the "Treatment")[1] involving the bumbling inspector. Later that year, before publication,[2] Richlin assigned all rights in the

---

[1]According to expert witness Dr. Drew Casper of the University of Southern California's School of Cinema-TV, a treatment is a "brief outline, in prose, describing the actions of a movie plot, indicating characters along the way with little or no dialogue; it will run no more than 25 pages, it is the last stage before beginning a screenplay proper and as such, functions as a source for a script." The Treatment is a fourteen-page mixture of story and staging. For example, the Treatment reads: "Festival that night. Table with Princess, George, Sir Charles, Simone and the Inspector. Checking on car—facts about Le Pouf—Princess sees Secretary and excuses herself. Simone and George dance. George suggests a later rendezvous. He will find a way to get rid of her husband."

[2]"Publication" is a term of art in the law of copyright. Publication before the effective date of the current Copyright Act divested an author

Treatment—including copyright and the right to renew that copyright—to a corporation that used it to create the smash-hit film, *The Pink Panther* (the "Motion Picture"). The Richlin heirs now claim federal statutory renewal rights in the Treatment and derivative works, including the Motion Picture. They assert that Richlin's coauthorship of the Treatment makes him a coauthor of the Motion Picture. Alternatively, they contend that, because the Motion Picture secured statutory protection for the portions of the Treatment incorporated into the Motion Picture, and because the copyright in the Motion Picture was renewed for a second term, they are co-owners of the Motion Picture's renewal copyright and all derivative works thereof. Although the Richlin heirs have developed several theories that could supply the answer to the question, "Who owns it?", unlike Inspector Clouseau, they have not quite stumbled upon a theory that favors them. We therefore affirm the district court's conclusion that the Richlin heirs have no interest in the copyright to the Motion Picture.

## I.   BACKGROUND

The material facts are largely undisputed. In April 1962, Maurice Richlin and Blake Edwards coauthored a fourteen-page Treatment initially entitled *The Pink Rajah*, but later renamed *The Pink Panther*. The Treatment served as the basis

---

of his common law copyright rights and injected the work into the public domain free for anyone to use. Publication in accordance with the statutory formalities of the 1909 Act, 17 U.S.C. § 10 (1909), however, both divested the owner of his common law copyright and invested him with federal statutory copyright protection. The rationale for this doctrine is rooted in the United States Constitution, which provides that "[t]he Congress shall have power . . . . [t]o promote the progress of science and useful arts, by securing, for limited times to authors and inventors, the exclusive right to their respective writings and discoveries." U.S. CONST. art. I, § 8, cl. 8. In exchange for securing the exclusive right to exploit his work that federal copyright accords, the author agrees that he will enjoy this monopoly for the limited duration Congress granted in the Copyright Acts, so that the public is the ultimate beneficiary. *See generally* 1 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT §§ 4.01, 4.03 (2007).

for the well-known motion picture, *The Pink Panther*, and numerous derivative works. It appears that the Treatment set forth many of the plot elements and characters, including Inspector Clouseau himself, developed into the screenplay and incorporated into the Motion Picture.

Richlin and Edwards entered into an employment agreement dated May 14, 1962 (the "Employment Agreement") with the Mirisch Corporation of Delaware ("Mirisch") to write the screenplay for the Motion Picture.[3] They agreed to create the screenplay as a "work made for hire." Under this contract, Richlin and Edwards combined received $150,000 for their work on the Treatment and the screenplay.[4]

Later that month, on May 24, 1962, Richlin and Edwards executed a literary assignment agreement (the "Assignment") whereby they transferred and assigned "forever . . . that certain story (which term shall cover all literary material written by [Richlin and Edwards] in connection therewith including any adaptations, treatments, scenarios, dialogue, scripts and/or screenplays) entitled: 'Pink Rajah' also entitled or known as 'Pink Panther' " in exchange for $1 "and other good and valuable consideration in hand" paid by Mirisch. Mirisch also received "the right to use [Richlin's and Edwards's] name[s] as the author of the literary composition upon which said adaptations, or any of them, are based." The Assignment further provided that if Mirisch copyrighted the Treatment, Mirisch "shall enjoy its rights hereunder for the full duration of such copyright or copyrights, including any and all renewals thereof."[5]

---

[3]The Richlin heirs contend that the Employment Agreement was executed on June 12, 1962. The precise date of the contract's execution does not affect our holding.

[4]A letter dated June 28, 1962, confirmed that "the $150,000 payment for property [the Treatment] and screenplay is divided $50,000 for property and $100,000 for screenplay."

[5]Although Richlin assigned to Mirisch all rights in the unpublished Treatment, an assignment of a statutory renewal copyright, assuming the

In 1963, *The Pink Panther* was released and distributed in theaters to great acclaim. It was followed by nine movie sequels,[6] many of which gave screen credit to Richlin and Edwards for creating the characters. The original Motion Picture bears a copyright notice of 1963 in the name of Mirisch and G&E Productions. In 1964, the U.S. Copyright Office issued a certificate of registration for the "motion picture" entitled "The Pink Panther" under the Copyright Act of 1909 ("1909 Act").

The Certificate of Registration identifies the claimant and author as "Mirisch-G&E Productions." The certificate lists the date of publication as March 18, 1964, but notes that the copyright notice on the Motion Picture bears a date of 1963. The Richlin heirs concede that neither the Treatment nor the screenplay was ever separately published or registered for federal copyright protection.

Richlin died on November 13, 1990. The original term of copyright in the Motion Picture—twenty-eight years from the first date of publication—was set to expire in 1991,[7] but it was

---

Treatment became the subject of statutory copyright, would not become effective unless the author/assignor lives to the commencement of the renewal term, which is when the renewal interest vests in the author. *See Stewart v. Abend*, 495 U.S. 207, 220 (1990) ("[I]f the author dies before the commencement of the renewal period, the assignee holds nothing." (citing *Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 377 (1960) ("Section 24 [of the 1909 Act] reflects, it seems to us, a consistent policy to treat renewal rights as expectancies until the renewal period arrives."))). The Richlin heirs' claim is based on Richlin's predeceasing the vesting of the renewal interest provided by statutory copyright.

[6]*A Shot in the Dark* (1964); *Inspector Clouseau* (1968); *The Return of the Pink Panther* (1975); *The Pink Panther Strikes Again* (1976); *Revenge of the Pink Panther* (1978); *Trail of the Pink Panther* (1982); *Curse of the Pink Panther* (1983); *Son of the Pink Panther* (1993); and *The Pink Panther* (2006).

[7]Under the 1909 Act, as amended, federal copyright protection was secured "by publication thereof with the notice of copyright required by [§ 19] of this title." 17 U.S.C. § 10 (1909). There is no dispute that the Motion Picture was released and distributed with proper notice in 1963,

renewed that year by the successors-in-interest to Mirisch-G&E Productions, MGM-Pathe Communications Co./ Geoffrey Productions Inc. (collectively, "MGM"). A Renewal Certificate issued, which identified MGM as the claimant and "proprietor of copyright in a work made for hire" and the author and original claimant as Mirisch-G&E Productions. None of the Richlin heirs attempted to secure a renewal interest in the Treatment or screenplay, and there is no separate renewal certificate for either.

The Richlin heirs filed suit in the United States District Court for the Central District of California seeking declaratory relief and an accounting. They claim a 50 percent renewal interest in the Treatment and all derivative works. During the course of this litigation, the theories undergirding this claim have evolved. The complaint relies on the theory that publication of the derivative work (the Motion Picture) effectuated publication of the underlying work (the Treatment). Under this theory, when MGM renewed the Motion Picture's statutory copyright in 1991, this renewed the copyright in the Treatment on behalf of the Richlin heirs, which gave the Richlin heirs an interest in the Motion Picture's renewal copyright. These principles carry some theoretical weight in copyright law; however, the Richlin heirs failed to renew their statutory copyright, if any, in the Treatment in 1991. That may explain why, by the time the district court granted summary judgment in favor of MGM, the Richlin heirs had abandoned their argument based on a statutory copyright in the Treatment. Instead, they argued that they have a copyright interest in the Motion Picture as coauthors based on Richlin's coauthorship of the Treatment, which was

---

although it was not registered with the U.S. Copyright Office until 1964. Because "the copyright secured by [the 1909 Act] . . . endure[d] for twenty-eight years from the date of first publication," 1991 was the year the original term would expire. *See id.* § 24. The Renewal Registration identifies its effective date as February 13, 1991.

incorporated into the Motion Picture. The district court ana-
lyzed the requirements of a "joint work" prepared by coau-
thors, who under copyright law would each be deemed an
owner of the copyright. The court rejected this theory
because, under the factors set forth in *Aalmuhammed v. Lee*,
202 F.3d 1227, 1234 (9th Cir. 2000), Richlin had no control
over the Motion Picture, and there was no manifestation of
intent—by contract or otherwise—that Richlin and Edwards
would be coauthors of the Motion Picture. *See id.* at 1234
(analyzing coauthorship under three factors: control, objective
manifestation of intent to be coauthors, and whether the audi-
ence appeal of the work can be attributed to all coauthors).
Because the coauthorship theory failed, the district court
awarded summary judgment in favor of MGM, declining to
reach any other issues. The Richlin heirs timely appeal.

## II.   JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C.
§ 1338, which confers subject matter jurisdiction over copy-
right actions. We have jurisdiction over final judgments of the
district courts pursuant to 28 U.S.C. § 1291.

We review a district court's grant of summary judgment de
novo. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).
In reviewing the grant of summary judgment, we "must deter-
mine, viewing the evidence in the light most favorable to the
nonmoving party, whether genuine issues of material fact
exist and whether the district court correctly applied the rele-
vant substantive law." *Id.*

## III.   DISCUSSION

On appeal, the Richlin heirs maintain their contention that
because Richlin and Edwards jointly authored the Treatment,
and the Treatment became a critical component of the Motion
Picture, Richlin was a coauthor of the Motion Picture, and
was therefore a co-owner on whose heirs' behalf MGM

secured a renewal interest in the Motion Picture's copyright in 1991. Alternatively, the Richlin heirs resort to the theory underlying their complaint. They contend that publication of the Treatment with the Motion Picture secured a statutory copyright for the Treatment, which was renewed on their behalf by MGM when it renewed the Motion Picture's copyright. We address each argument in turn.

## A. Coauthorship of the Motion Picture

To determine whether Richlin had an interest in the Motion Picture's federal statutory copyright, we must consider the question of coauthorship. The Richlin heirs argue that because Richlin coauthored the Treatment, which was a substantial component of the Motion Picture, he is also a coauthor of the Motion Picture. This coauthorship, according to the Richlin heirs, gives them an interest in the Motion Picture's copyright. Under this facially appealing, but legally unsustainable, argument, an interest in the renewal term of copyright and all subsequent motion pictures and adaptations based on that copyright would revert to the Richlin heirs.[8] *See* 17 U.S.C. § 201(a) (1976) ("The authors of a joint work are coowners of copyright in the work.").

[1] We agree with the district court that Richlin and Edwards were not coauthors of the Motion Picture. Richlin and Edwards wrote the Treatment in 1962, and the Motion Picture was copyrighted when published with notice in 1963; therefore, the Richlin heirs' claim of coauthorship is governed by the 1909 Act. The 1909 Act, however, did not expressly mention or define joint works or coauthorship. Nevertheless, as early as 1915, in *Maurel v. Smith*, Judge Learned Hand applied the universally adopted common law definition of

---

[8]The Richlin heirs' claim to the renewal copyright in the Motion Picture rests on the rule that an assignment of renewal rights by the author of a copyrighted work does not become effective unless the renewal interest vests in the then-living author. *See Abend*, 495 U.S. at 220.

joint authors to the 1909 Act, holding that they "undertake jointly to write a play, agreeing on the general outline and design and sharing the labor of working it out." 220 F. 195, 199 (S.D.N.Y. 1915) (quoting *Levy v. Rutley*, L.R. 6 C.P. 523 (1871)); *see also Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266, 267 (2d Cir. 1944) ("[I]t is enough that they mean their contributions to be complementary in the sense that they are to be embodied in a single work to be performed as such."); LIOR ZEMER, THE IDEA OF AUTHORSHIP IN COPYRIGHT 190 n.15 (2007) ("In *Levy v. Rutley*, the earliest recorded case on joint authorship, Byles[,] J[.] found joint authorship to exist although one person had contributed a very small amount of work to the execution."). Then, in *Picture Music, Inc. v. Bourne, Inc.*, a district court suggested a "statutory revision[ ] of the copyright law [that] would define a 'joint work' as one 'prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.' " 314 F. Supp. 640, 646 (S.D.N.Y. 1970). This was the precise wording that Congress used to define "joint work" when it enacted the 1976 Act. *See* 17 U.S.C. § 101 (1976). As Professor Nimmer explains, "[t]he 1909 Act did not expressly refer to the doctrine of joint ownership, but its principles, largely unchanged under the current Act, were firmly established by case law, and were applicable to common law as well as statutory copyright." 1 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT § 6.01 n.1 (2007). Because the 1976 Act incorporated the well-established case law interpreting the definition of "joint work" under the 1909 Act, we may assess the Richlin heirs' claim under the more fully developed rubric of the 1976 Act.

**[2]** Section 101 of the 1976 Act defines "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101 (1976). A "joint work" requires each author to make "an independently copyrightable contribution." *Ashton-Tate Corp. v. Ross*, 916 F.2d 516, 521 (9th Cir. 1990). "The authors of a joint work

are coowners of copyright in the work." 17 U.S.C. § 201(a) (1976). Even if a person's contribution is minor, once he is accorded joint authorship status, he enjoys all benefits of joint authorship. *See Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068 (7th Cir. 1994); *Cmty. for Creative Non-Violence v. Reid*, 846 F.2d 1485, 1498 (D.C. Cir. 1988), *aff'd on other grounds*, 490 U.S. 730 (1989); *Bencich v. Hoffman*, 84 F. Supp. 2d 1053, 1055 (D. Ariz. 2000); 1 NIMMER § 6.08.

**[3]** In *Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000), we set forth three criteria for determining whether a work is jointly authored under § 101. First, we determine whether the "putative coauthors ma[de] objective manifestations of a shared intent to be coauthors." *Id.* A contract evidencing intent to be or not to be coauthors is dispositive. *Id.* Second, we determine whether the alleged author superintended the work by exercising control. *Id.* Control will often be the most important factor. *Id.* Third, we analyze whether "the audience appeal of the work" can be attributed to both authors, and whether "the share of each in its success cannot be appraised." *Id.* (quotations omitted).

The plain language of § 101 makes clear that Richlin is a coauthor of the Treatment. Viewing the facts in the light most favorable to the Richlin heirs, Richlin and Edwards could have secured statutory copyright for the Treatment before assigning it to Mirisch, as it was a fourteen-page original creative story written jointly by Richlin and Edwards. *See* 17 U.S.C. § 4 (1909) ("The works for which copyright may be secured under this title shall include all the writings of an author."); 17 U.S.C. § 102 (1976) ("Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . . ."); 1 NIMMER §§ 2.04 and 6.01 (articulating standards for "literary works" and "joint works"). Moreover, the Treatment "was prepared by two or more authors," Richlin and Edwards, who clearly intended that it be "merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101 (1976). Indeed, this is what Richlin

and Edwards accomplished when they presented the completed Treatment to Mirisch.

But the Treatment is not the appropriate reference point. The Richlin heirs' claim for declaratory relief and an accounting rests on their argument that, by virtue of his contribution to the Treatment, Richlin is coauthor of the Motion Picture. Thus, the work that must be examined to determine joint authorship is the Motion Picture, not the Treatment. The plain language of § 101 does not shed light on whether Richlin was a coauthor of the Motion Picture. Applying the *Aalmuhammed* factors to Richlin's involvement in the Motion Picture, however, confirms that Richlin and Edwards were not coauthors of that work.

**[4]** We must first determine whether "putative coauthors ma[de] objective manifestations of a shared intent to be coauthors." *Aalmuhammed*, 202 F.3d at 1234. A contract evidencing intent to be or not to be coauthors is dispositive. *Id.* In the absence of a contract, we look to other objective evidence of intent. *Id.* The district court found that the Assignment was contractual evidence of an objective manifestation that the parties did *not* intend to be coauthors. The district court reasoned that the Assignment conveyed forever "that certain story . . . including any adaptations, treatments, scenarios, dialogue and/or screenplays." Professor Nimmer clarifies that "forever," when used in conjunction with conveyance of a *copyrighted* work (which the Treatment was not), "should be considered a shorthand for 'the original and renewal term of copyright, plus any extensions, reversions, resurrections, or other circumstances that prolong the term.' " 3 NIMMER § 10.14[N]. Although the Treatment was not the subject of a federal statutory copyright, we agree with the district court that when Richlin and Edwards conveyed all present and future interests in the Treatment and derivative works to Mirisch, the parties to the contract could not consistently entertain the intent that Richlin and Edwards would be coauthors of the Motion Picture. Rather, Mirisch was given the

right to exploit the Treatment in any way he chose. In any event, no language in the Assignment indicates any intent that Richlin and Edwards were to coauthor the Motion Picture.

[5] In light of the Assignment, the Employment Agreement, and the surrounding circumstances, there were no "objective manifestations of a shared intent to be coauthors." *Aalmuhammed*, 202 F.3d at 1234. The Assignment conveyed to Mirisch all present and future rights in the Treatment and derivative works, including the common law "copyright." Neither the Assignment nor the Employment Agreement said anything about Richlin becoming a coauthor of the Motion Picture. None of *The Pink Panther* sequels lists Richlin as coauthor; rather, they simply give him screen credit as the creator of the original story and characters. Both the initial- and renewal-term statutory copyright registrations list Mirisch and its successors-in-interest as authors of the Motion Picture, not Richlin. Furthermore, the Employment Agreement specified that Richlin and Edwards were Mirisch's "employees," rendering the screenplay a "work made for hire," which is also inconsistent with the view that Richlin coauthored the Motion Picture.[9] *See* 17 U.S.C. § 26 (1909); *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003) ("[I]f the work is made for hire, 'the employer or other person for

---

[9]On November 25, 1992, MGM sent a check for $8,563.62 and a letter to Richlin's widow, Louise Richlin, stating "[t]his check constitutes payment in full for any rights used in or relating to [*Son of Pink Panther*] that are owned or controlled by Maurice Richlin or by you pursuant to the Writers Guild of America agreement or otherwise."

Upon first inspection, this would appear to be a clue as to which parties or persons own the renewal interest in the Motion Picture. However, such monies paid are but one more lead into a dead end. In February 1965, Richlin, Edwards, and the Writers Guild of America entered into a settlement agreement with Mirisch resolving a dispute regarding *A Shot in the Dark* and the applicability of sequel payments. The check paid to Louise Richlin in 1992 was issued pursuant to this settlement agreement, which is a contractual matter unrelated to the question of ownership of the renewal copyright interest in the Motion Picture.

whom the work was prepared is considered the author . . . , and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all the rights in the copyright.' " (quoting 17 U.S.C. § 201(b) (1976))).

**[6]** The second factor—whether Richlin supervised the Motion Picture by exercising control—favors MGM as well. Richlin did not exercise any supervisory powers over the Motion Picture, a factor that *Aalmuhammed* indicates will often be the most important. *Aalmuhammed*, 202 F.3d at 1234. The Assignment granted to Mirisch "forever . . . the absolute and unqualified right to use the [Treatment], in whole or in part, in whatever manner said purchaser may desire." Thus, while Richlin may have had control over the Treatment as originally written, he had no control over how the Treatment was incorporated into the Motion Picture. Moreover, although Richlin and Edwards cowrote the screenplay, the screenplay was a work made for hire pursuant to the Employment Agreement, making Mirisch the author/owner of the screenplay. 17 U.S.C. § 26 (1909); *Warren*, 328 F.3d at 1140. Any control that Richlin may have had over the screenplay does not lend support to his claim that he exercised any control over the creation of the Motion Picture.

We agree with the district court that the third factor, whether "the audience appeal of the work" can be attributed to both authors, and whether "the share of each in its success cannot be appraised," favors the Richlin heirs, in light of the summary judgment standard. *Aalmuhammed*, 202 F.3d at 1234. As the district court noted, it is nearly impossible to determine how much of the Motion Picture's audience appeal and success can be attributed to the Treatment. Although the characters that Richlin helped to create formed the basis for the Motion Picture's success, perhaps it was Peter Sellers's legendary comedic performance, Henry Mancini's memorable score, or Blake Edwards's award-winning direction[10] —none

---

[10]Edwards was nominated for an Academy Award in 1982 for writing *Victor/Victoria*, and received an honorary Academy Award in 2003 "in

of which can be attributed to Richlin—that was the main draw. Nevertheless, given that the Motion Picture adopted the characters and original story from the Treatment, and that, absent the Treatment, the Motion Picture likely would not exist, we cannot say the district court erred in finding that this factor favors the Richlin heirs.

**[7]** Given that the two primary *Aalmuhammed* factors weigh most heavily in favor of Appellees, we hold that Richlin was not a coauthor of the Motion Picture. Therefore, there is no renewal interest in the Motion Picture that might conceivably have vested in the Richlin heirs under a theory of coauthorship.

## B.      Significance of "Publication" of the Treatment

**[8]** At the time the Treatment was incorporated into the Motion Picture,[11] the Treatment was neither published nor the subject of federal statutory copyright. From this predicate, the Richlin heirs weave together a string of copyright truisms culled principally from *Batjac Productions Inc. v. Goodtimes Home Video Corp.*, 160 F.3d 1223 (9th Cir. 1998), *Stewart v. Abend*, 495 U.S. 207 (1990), and *Selznick v. Turner Entertainment Co.*, 990 F. Supp. 1180, 1185 (C.D. Cal. 1997), to

---

recognition of his writing, directing and producing an extraordinary body of work for the screen," such as *The Pink Panther* series and *Breakfast at Tiffany's*.

[11]All parties agree, at least for purposes of summary judgment and appeal, that the Treatment was incorporated into the Motion Picture. Those copyrightable elements of the Treatment that were not incorporated into the Motion Picture retained their common law copyright protection because they were not published, and received statutory copyright protection with the enactment of the 1976 Act. *See* 17 U.S.C. § 303(a) (1976); 3 NIMMER § 9.09[A]. The questions of whether any such copyrightable elements that were not incorporated into the Motion Picture exist, and if so, what they might be and whether they constitute a copyrightable "work," are not before us on this appeal.

theorize that the Treatment achieved statutory copyright protection when the Motion Picture was published with notice in 1963. They further argue that because Richlin predeceased the vesting of the statutory renewal rights in the Treatment, those renewal rights reverted to the Richlin heirs. When MGM renewed the statutory copyright in the Motion Picture, this renewed the Treatment's statutory copyright on behalf of the Richlin heirs.[12] And, because the Motion Picture incorporated the Treatment, the Richlin heirs are now co-owners of the Motion Picture's copyright.

**[9]** Our analysis begins with an assessment of exactly what rights Richlin did and did not own when he assigned all rights in the Treatment to Mirisch on May 24, 1962. The original copyright in the Motion Picture is governed by the 1909 Act because the Treatment and the Motion Picture were created before January 1, 1978, when the Copyright Act of 1976 ("1976 Act") became effective. 17 U.S.C. § 304 (1976). The copyright was renewed in 1991, after the effective date of the 1976 Act. Thus, to analyze questions arising from events that occurred before January 1, 1978, such as who is the author of the Treatment, the 1909 Act applies; for events that occurred after that date, such as registration of the renewal copyright, the 1976 Act applies. *See* 1 NIMMER OV-7 ("In determining the corpus of law that governs a particular situation, the guiding principle should be to apply the law in effect when the infringement (or other activity), upon which suit is based, arises.").

**[10]** Unlike the 1976 Act, the 1909 Act recognized a distinction between state (or common law) and federal copyright protection. *Batjac*, 160 F.3d at 1226. Unpublished works were protected by state common law or statute, while works pub-

---

[12]According to the Richlin heirs, because Edwards lived to the renewal term, MGM retained the right to renew the supposed statutory copyright in the Treatment, even though Richlin's interest in the Treatment had reverted to his heirs.

lished in accordance with the statutory formalities received federal statutory protection. *Id.* State common law protection —which afforded only rights of first publication and transferability of ownership—commenced when the work was created and ended when the work was published. *See* 1 NIMMER § 2.02. Once published, the work would obtain federal statutory protection, as long as it was published with proper notice. 17 U.S.C. §§ 10, 19 (1909). The duration of statutory copyright was twenty-eight years, with the option to renew for another twenty-eight years. *Id.* § 24.

**[11]** Because the Treatment was not published at the time of the Assignment, Richlin's and Edwards's property interest in it is governed by California law at the time of transfer. *Wheaton v. Peters*, 33 U.S. 591, 658 (1834) ("When . . . a common law right is asserted, we must look to the state in which the controversy originated."). In California, "the basic principles governing 'common law' copyright have been codified in Civil Code section 980 et seq." *Zachary v. W. Publ'g Co.*, 75 Cal. App. 3d 911, 918 (1977). When Richlin and Edwards submitted the Treatment to Mirisch, it was the subject of California state law (otherwise known as "common law") copyright protection. As coauthors, in the absence of a contrary agreement, they were joint owners of the Treatment. CAL. CIV. CODE § 981(a) (1949). Pursuant to former California Civil Code § 980 *et seq.*, they had the right "to *exclusively* possess it, use it, and transfer or otherwise dispose of it." 13 WITKIN SUMMARY OF CAL. LAW (10th ed. 2005) Personal Property, § 46; *see also Carpenter Found. v. Oake*s, 26 Cal. App. 3d 784, 793 (1972).

**[12]** California common law copyright provided for two key mechanisms to divest the copyright owner of his copyright—publication and transfer. Once the copyright owner published his work, it lost all common law copyright protection.[13] *See Carpenter*, 26 Cal. App. 3d at 793 ("[I]f the

---

[13]If the owner of a common law copyright published the work without complying with federal statutory requirements, it would enter the public domain. *Abend*, 495 U.S. at 233.

owner publishes the composition, it may be used by any person . . . ."); CAL. CIV. CODE § 983(a) (1949). The copyright owner could also transfer his right of first publication before the work was published. CAL. CIV. CODE § 982 (1949); *Loew's Inc. v. Superior Court*, 18 Cal. 2d 419, 421 (1941). Once the common law copyright is transferred, however, "the transferee becomes the lawful owner, unhindered by the fact that he is not the author." *Carpenter*, 26 Cal. App. 3d at 794-95.

**[13]** It is undisputed that the Treatment was unpublished and not the subject of federal statutory copyright protection when Richlin and Edwards transferred it to Mirisch. The transfer of that state common law right neither invested the Treatment with statutory copyright protection nor divested the work of its common law copyright protection. The significance of the transfer, however, is that Mirisch became the owner of the common law copyright in the Treatment. *See id.* In 1963, Mirisch published the Motion Picture with notice, thus securing federal statutory protection for the Motion Picture.

**[14]** Acknowledging that the Treatment was unpublished until its copyrightable elements were published by virtue of the release and distribution of the Motion Picture in 1963 as components thereof, the Richlin heirs argue, in misplaced reliance upon our decision in *Batjac*, that the 1991 renewal of the Motion Picture effected a renewal of the unpublished Treatment's—now statutory—copyright. In *Batjac*, James Edward Grant wrote an original screenplay entitled "McLintock!" and almost immediately assigned all rights in the unpublished screenplay to Batjac, who incorporated the screenplay into the motion picture by the same name. *Batjac*, 160 F.3d at 1225. The motion picture was released to the general public and received federal statutory copyright protection in 1963. *Id.* Batjac failed to renew the copyright in the motion picture, which fell into the public domain in 1991. *Id.* After GoodTimes Home Video Corp. ("GoodTimes") began producing and selling videocassettes of the motion picture, Bat-

jac sought copyright registration for two intermediate drafts of the screenplay, and then brought suit against GoodTimes for copyright infringement. *Id.* Batjac's suit was brought to a halt when the Copyright Office rejected Batjac's application to copyright the portions of the screenplay that were incorporated into the motion picture, on the ground that the motion picture—and all of its component parts—had fallen into the public domain. *Id.* On Batjac's challenge to this ruling, we deferred to the Copyright Office's interpretation of the 1909 Act and held that the "screenplay was copyrightable and is a component of the motion picture to the extent it was incorporated into the film. As such, it fell into the public domain with the motion picture." *Id.* at 1235 (citing 17 U.S.C. § 3 (1909) ("The copyright provided by this title shall protect all the copyrightable component parts of the work copyrighted . . . .")); *see also id.* at 1233 ("[A]n unpublished screenplay protected by common law is published by a motion picture to the extent that it is incorporated."); *Shoptalk, Ltd. v. Concorde-New Horizons Corp.*, 168 F.3d 586, 591, 592 (2d Cir. 1999) ("We conclude . . . that if a previously unpublished screenplay is embodied in a motion picture, so much of the screenplay as is disclosed in the motion picture is published when the motion picture is published."); *Classic Film Museum, Inc. v. Warner Bros., Inc.*, 597 F.2d 13, 14-15 (1st Cir. 1979) (holding that when the statutory copyright to a motion picture fell into the public domain, so too did any common law copyright in the motion picture's component parts, such as the screenplay); 1 NIMMER § 4.12[A] ("Because a derivative work by definition to some extent incorporates a copy of the pre-existing work, publication of the former necessarily constitutes publication of the copied portion of the latter.").

[15] Under *Batjac*, publication of the Motion Picture published those elements of the Treatment incorporated into the Motion Picture, *see* 17 U.S.C. § 3 (1909), and thus the Motion Picture's federal statutory copyright protection extended to those copyrightable elements of the Treatment that were pub-

lished as components of the Motion Picture; however, this did not constitute publication of the Treatment "as such"—i.e., as a work standing alone. We have held that courts should generally defer to the Register of Copyright's ("Register") interpretation of the copyright statutes, as " '[t]he Register has the authority to interpret the copyright laws and . . . its interpretations are entitled to judicial deference if reasonable.' " *Batjac*, 160 F.3d at 1230 (quoting *Marascalco v. Fantasy, Inc.*, 953 F.2d 469, 473 (9th Cir. 1991)). Accordingly, in *Batjac* we adopted the Register's view that publication of the screenplay, or here, the Treatment, did not publish the Treatment as an independent work, but just those portions incorporated into the published work. We deferred to the Register's reliance on the *Compendium of Copyright Office Practices*, which governed the Register's practices under the 1909 Act. The *Compendium* provides:

> Publication of a portion of a work does not necessarily mean that the work as a whole has been published.
>
> Examples:
>
> (1)   Publication of a detailed plot summary of a play does not constitute publication of the play as a whole.
>
> (2)   Publication of a movie version of an unpublished story does not constitute publication of the story as such.

*Batjac*, 160 F.3d at 1230 (quoting Compendium I, COMPENDIUM OF COPYRIGHT OFFICE PRACTICES § 3.1.1 IV(a)). The *Compendium* makes clear that, by virtue of the publication of the Motion Picture, the Treatment "as such" did not become the subject of statutory copyright. Rather, only those elements of the Treatment that were incorporated into the Motion Picture were published, and they were statutorily protected as compo-

nents of the Motion Picture, not as an independent "work." Thus, we reject the Richlin heirs' contention that publication of the Motion Picture with notice invested the Treatment with a statutory copyright.[14]

The Richlin heirs contend that this reading of *Batjac* is inconsistent with the Supreme Court's decision in *Stewart v. Abend*. There, Cornell Woolrich authored a short story entitled "It Had to Be Murder," which was published as a collective work with other short stories in Dime Detective Magazine ("Dime Detective") in 1942. *Abend*, 495 U.S. at 211. Woolrich assigned to Dime Detective only his right to publication, retaining all other rights. *Id.* When the magazine was published, the magazine's blanket copyright notice secured federal statutory copyright for the separate and independent works it contained, including Woolrich's story. *Id.* In 1945, Woolrich assigned to a producer the federal statutory right to make a motion picture version of "It Had to Be Murder," and also agreed to renew the copyright in the story and to assign the same motion picture rights to the producer at the appropriate time. *Id.* at 212. The producer subsequently assigned his rights to Jimmy Stewart and Alfred Hitchcock's production company, which developed "It Had to Be Murder" into the motion picture *Rear Window*. *Id.* Woolrich died before the renewal term commenced. *Id.* at 213. The executor of Woolrich's estate then renewed the copyright in the story and assigned it to Abend, who, years later, sued Stewart, Hitchock, MCA Inc., and Universal Film Exchanges for infringement of the right to distribute *Rear Window* during the story's renewal term of copyright. *Id.* at 212-13. The Supreme Court held that "if the author dies before the renewal period, then the assignee may continue to use the original work only

---

[14]Although the copyright in the Motion Picture "protect[ed] all the copyrightable component parts of the work," 17 U.S.C. § 3 (1909), that is not the same as securing a copyright in those component parts. Richlin and Edwards would have had to publish the Treatment itself with notice to secure a copyright in that "work" under the 1909 Act.

if the author's successor transfers the renewal rights to the assignee." *Id.* at 221; *see also id.* at 219 ("[W]hen an author dies before the renewal period arrives, his executor is entitled to the renewal rights, even though the author previously assigned his renewal rights to another party."); *id.* at 219-20 ("The right of renewal is contingent. It does not vest until the end [of the original term.]" (quoting 5 LEGISLATIVE HISTORY OF THE 1909 COPYRIGHT ACT, Part K, p. 77 (E. Brylawski & A. Goldman eds. 1976) (statement of Mr. Hale))). Therefore, because Woolrich was not alive at the commencement of the renewal term, the renewal term of copyright did not vest in him, and his prevesting transfer was null and void. Abend, the assignee of the executor of Woolrich's estate, was the rightful owner of the renewal term of copyright in the story "It Had to Be Murder." *Id.* at 235-36.

Richlin died in 1990. Had the Treatment become the subject of statutory copyright as a separate and independent work, its renewal term would not commence until 1991. According to the Richlin heirs, because Richlin, like Woolrich, died before the right to renew the copyright vested, the right to renew the copyright in the Treatment reverted to them.[15] The disconnect in this theory is that, unlike the story "It Had to Be Murder," an independent work, the Treatment was never the subject of federal copyright protection as an independent work. Because it never was invested with statutory copyright protection, there was no right to renew and, therefore, no renewal right to revert to the Richlin heirs.

[16] Indeed, the Copyright Office has rejected the Richlin heirs' theory that previously unpublished components of a motion picture receive independent statutory copyright protection by virtue of incorporation into a motion picture that itself becomes the subject of federal statutory copyright pro-

---

[15]Under this theory, during the supposed first term of copyright, the Richlin heirs would have had no interest because Richlin was free to assign, and did assign, all rights to Mirisch.

tection. In *Husbands*, the Copyright Office Board of Appeals ("BOA") expressly ruled that an unpublished underlying work that is incorporated into a statutorily copyrighted motion picture does not receive a statutory copyright independent of the motion picture's copyright. *Husbands*, Copyright Office Board of Appeals Letter, Control No. 10-600-754-2(C), at 6 (May 14, 2002), *available at* http://www.ipmall.info/hosted_ resources/CopyrightAppeals. There, John Cassavetes authored a screenplay, but did not secure statutory copyright in the work. *Id.* at 1. He transferred "the rights" to Faces Music Inc., which incorporated the screenplay into the motion picture, *Husbands*. The motion picture received federal statutory copyright protection in 1970. *Id.* at 2. In 1998, when it came time to renew the motion picture's copyright for its second term, Cassavetes's heirs filed two renewal copyright registrations, one for the screenplay and one for the motion picture. *Id.* at 1. The Copyright Office issued the renewal registration in the motion picture, but denied the application for renewal of copyright in the screenplay. *Id.* The Cassavetes heirs appealed to the BOA, making the identical arguments as the Richlin heirs.

The BOA upheld the Copyright Office's rejection of the heirs' application for a renewal copyright interest in the screenplay, reasoning:

> The Copyright Office considered a motion picture to be a unified work of authorship for purposes of registration under the 1909 law. The Office's *Compendium I* (1973) described a motion picture as "ordinarily . . . embod[ying] a large number of contributions, including those of the author of the story, author of the screenplay, director, editor, cameraman, individual producer, etc. These persons are not regarded as the 'author' of the film in the copyright sense. *Compendium I* further states that most motion pictures were works made for hire, with the production company's [sic] being the employer in

most cases. The Office's understanding of motion
picture authorship . . . as consisting of contributions
or parts, each of which is meant to be joined to other
contributions or parts, in order to produce an inte-
grated entity underlies this understanding.

. . . .

The failure of the screenplay author . . . to have
reserved via registration the copyright in the unpub-
lished version of the screenplay . . . , thus rendering
the screenplay's copyright for purposes of the public
registration record separate and apart from the copy-
right in the motion picture, means that the Office,
viewing the motion picture as an integrated entity,
cannot now insert into the public record a claim to
renewal rights owned by a party different from the
owner of record of the rights in the integrated entity,
i.e., in the motion picture as a whole.

*Id.* at 4, 6 (citations omitted).

Even absent the principle of deference to the views of the
Copyright Office, we would find the BOA's analysis persua-
sive. A motion picture is a work to which many contribute;
however, those contributions ultimately merge to create a uni-
tary whole. As one district court explained, "it is impossible
to cleave the story, screenplay and musical score of a motion
picture film from the film itself." *Classic Film Museum, Inc.
v. Warner Bros., Inc.*, 453 F. Supp. 852, 855-56 (D. Me.
1978). Though publication of a motion picture with notice
secures federal statutory copyright protection for all of its
component parts, *see* 17 U.S.C. § 3 (1909), that does not
mean that the component parts necessarily each secure an
independent federal statutory copyright. The component parts
may or may not be copyrightable; they may or may not be the
subject of an independent statutory copyright when they are
incorporated into the motion picture. As *Abend* itself demon-

strates, the author of a work at common law must secure a federal copyright for that work for the right to renew to vest in either him or his heirs. The statutory copyright of a motion picture precludes the public from copying or otherwise infringing upon the statutory rights in the motion picture, including its component parts. However, when Mirisch secured federal statutory copyright for the Motion Picture, it did not also secure a federal statutory copyright for the Treatment. Assuming the Treatment is a copyrightable work, Richlin and Edwards simply failed to secure federal copyright for it.

**[17]** The Richlin heirs turn to *Selznick v. Turner Entertainment Co.* to argue that when the original term of copyright in the Motion Picture was renewed, the statutory copyright in the Treatment was also renewed. The entire reading audience by now will know how to resolve this contention: There was no statutory copyright in the Treatment to renew; therefore, renewal of the Motion Picture's copyright did nothing to affect the Treatment's copyright status. In *Selznick*, the plaintiff and defendants were undisputed co-owners of a federal statutory copyright in the classic motion picture *Gone With the Wind*. The defendants filed a renewal copyright registration in their names only, and claimed that this renewal eradicated the plaintiff's interest in the copyright. *Selznick*, 990 F. Supp. at 1186. The district court rejected this argument, ruling that "[i]t is well-established that the co-owner claiming the renewal takes legal title to the renewal copyright as constructive trustee on behalf of the non-renewing co-owner." *Id.* (citing *Pye v. Mitchell*, 574 F.2d 476, 480 (9th Cir. 1978)).

Therefore, the Richlin heirs' reliance on *Selznick* necessarily returns us to their flawed premise that Richlin coauthored the Motion Picture, and thereby became a co-owner of the Motion Picture's statutory copyright. Unlike in *Selznick*, however, Richlin was not a coauthor of the Motion Picture. Moreover, the Richlin heirs have wholly failed to demonstrate how the Motion Picture's incorporation of the Treatment invested

in them an ownership interest in the Motion Picture's renewal copyright term. Although the Richlin heirs are correct that, under *Batjac*, publication of the Motion Picture also published those copyrightable elements of the Treatment incorporated into the Motion Picture, it is a nonsequitur to conclude that the Richlin heirs thereby gained a statutory copyright in the Treatment or the Motion Picture. As MGM points out, the only way on these facts for Richlin to be a co-owner of the copyright in the Motion Picture is if he had been a coauthor. Richlin, however, did not coauthor the Motion Picture. Therefore, *Selznick*'s holding that a joint owner who renews a copyright acts as a constructive trustee for the other joint owners is inapposite.

**[18]** In the end, the Richlin heirs ask us to consider one question: "For what reason should Richlin's heirs be treated any differently than the heirs of any other author?" The answer is clear: Richlin failed to secure federal statutory copyright protection for the Treatment. Therefore, the Treatment as such was never invested with statutory copyright, and a right to renew the original term of statutory copyright neither vested in Richlin nor reverted to his heirs. Because Richlin neither co-owned nor coauthored the Motion Picture, neither he nor his heirs have any interest in its copyright.

## IV.  CONCLUSION

For the foregoing reasons, we affirm the district court's decision.

**AFFIRMED.**